# **EXHIBIT B**

**Exihibit B**

| Store # | Store Name | Merchandise | Royalty | Delivery & Shuttle Fees | Warranty | Other | Statement Total | Marketing Exp Invoice | Total AR |
|---|---|---|---|---|---|---|---|---|---|
| 230 | Evansville | $ 206,608.01 | $ 2,809.50 | | $ 3,401.37 | | $ 212,818.88 | $ 13,699.33 | $ 226,518.21 |

## Account Status

## 230 Evansville

| Invoice Number | Type | Invoice Date | Due Date | Currency | Invoice Amount | Balance Due |
|---|---|---|---|---|---|---|
| 230-0000205 | Merchandise INV | 24-JAN-20 | 08-FEB-20 | USD | 27,397.42 | 27,397.42 |
| 230-0000206 | Merchandise INV | 31-JAN-20 | 15-FEB-20 | USD | 28,592.10 | 28,592.10 |
| 230-0000210 | Merchandise INV | 07-FEB-20 | 22-FEB-20 | USD | 34,888.60 | 34,888.60 |
| 230-0000211 | Merchandise INV | 14-FEB-20 | 29-FEB-20 | USD | 26,002.63 | 26,002.63 |
| 230-0000212 | Merchandise INV | 21-FEB-20 | 07-MAR-20 | USD | 31,314.87 | 31,314.87 |
| R230030820 | Royalty INV | 08-MAR-20 | 11-MAR-20 | USD | 2,809.50 | 2,809.50 |
| 230-0000213 | Merchandise INV | 28-FEB-20 | 14-MAR-20 | USD | 30,416.02 | 30,416.02 |
| 230-0000214 | Warranty INV | 29-FEB-20 | 15-MAR-20 | USD | 2,590.85 | 2,590.85 |
| 230-0000216 | Merchandise INV | 06-MAR-20 | 21-MAR-20 | USD | 27,996.37 | 27,996.37 |
| 230-0000217 | Warranty INV | 08-MAR-20 | 23-MAR-20 | USD | 810.52 | 810.52 |
| | | | | | Total Due | 212,818.88 |

Report Run Date - 15-MAR-2020

FRANCHISE BILLING
LOCATION 230
SHF HOLDINGS EVANSVILLE - EVANSVILLE, IN

| Inv # | Inv Date | Type of Billing | Amount Billed | Date Bill Sent | Due Date | ACH Date | Amount Received | Amount Owed |
|---|---|---|---|---|---|---|---|---|
| 230-0000138 | 06/05/19 | Merchandise (APPLY $7K P'MTS) | 30,413.62 | 06/06/19 | 8/30,9/6,9/16, | 8/30,9/6,9/16 | 20,290.78 | 10,122.84 |
| 230-0000149 | 07/03/19 | Merchandise (APPLY $7K P'MTS) | 45,393.99 | 07/08/19 | 7/12 ($15K) & | 7/12 & | 15,000.00 | 30,393.99 |
| 230-0000150 | 07/10/19 | Merchandise (APPLY $7K P'MTS) | 26,714.88 | 07/11/19 | ? | | | 26,714.88 |
| 230-0000151 | 07/12/19 | Merchandise (APPLY $7K P'MTS) | 28,825.63 | 07/15/19 | ? | | | 28,825.63 |
| 230-0000152 | 07/17/19 | Merchandise (APPLY $7K P'MTS) | 38,898.00 | 07/18/19 | 7/25 ($10K) & | 7/25 & | 10,000.00 | 28,898.00 |
| 230-0000154 | 07/24/19 | Merchandise (APPLY $7K P'MTS) | 46,452.08 | 07/29/19 | 8/1 ($16K) & | 08/01/19 | 16,000.00 | 30,452.08 |
| | | | | | | | Total | 155,407.42 |

ROYALTY FEE TO CHANGE BACK TO 5% ON 3/31/20

# FRANCHISE BILLING FORM

## ART VAN FURNITURE

| DECEMBER | 2019 |
| --- | --- |
| STORE | 230 | EVANSVILLE |
| INVOICE | 230-123119 |

| INVOICE DATE: | 3/8/2020 |
| --- | --- |
| DUE DATE: | 3/13/2020 |

| STORE # | STORE NAME | BILLING DEPT | NAME | INVOICE # | DATE | DESCRIPTION | Q | PRICE | SUB TOTAL | FREIGHT/ ROUNDING | TAX | GRAND TOTAL |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| 230 | EVANSVILLE | ART VAN | DAMAGE/REPAIR CREDITS - ART VAN | 123119 | 12/31/19 | DAMAGE & REPAIR CREDITS | 1 | (56.25) | (56.25) | | | (56.25) |
| 230 | EVANSVILLE | ADVERTISING | FALL 2019 CATALOG | 123119 | 12/31/19 | FALL 2019 CATALOG MASS MAILING | 1 | 3,503.74 | 3,503.74 | | | 3,503.74 |
| 230 | EVANSVILLE | ART VAN | ART VAN | 123119 | 12/31/19 | COMMISSIONS BILLED - (see attached detail) | 1 | 105.21 | 105.21 | | | 105.21 |
| 230 | EVANSVILLE | ART VAN | ELITE REWARDS | 123118 | 12/31/18 | ELITE REWARDS FOR JAN-DEC 2018 (PYMT 12 OF 12) | 1 | 1,616.44 | 1,616.44 | | | 1,616.44 |
| 230 | EVANSVILLE | ART VAN | ELITE REWARDS | 123119 | 12/31/19 | ELITE REWARDS FOR DECEMBER 2019 | 1 | 250.00 | 250.00 | | | 250.00 |
| 230 | EVANSVILLE | ADVERTISING | GRAPHIC EAST | 81550 | 11/20/19 | BLACK FRIDAY FREE SEALY BED IN BOX POSTESS GE#61457 | 1 | | 7.29 | | 0.44 | 7.73 |
| 230 | EVANSVILLE | ADVERTISING | GRAPHIC EAST | 81581 | 11/19/19 | 2019 TOYS FOR TOTS POSTESS GE#61414 | 2 | | 12.79 | | 0.77 | 13.56 |
| 230 | EVANSVILLE | ADVERTISING | GRAPHIC EAST | 81582 | 11/19/19 | DECEMBER 2019 EVENT POSTESS 12/4 WINTER HOLIDAY SALE 12/12 BLKFRI | 8 | | 9.09 | | 0.55 | 9.64 |
| 230 | EVANSVILLE | ADVERTISING | GRAPHIC EAST | 81583 | 11/19/19 | BLACK FRIDAY GIFT CARDS GE#61451 | 200 | | 7.36 | | 0.44 | 7.80 |
| 230 | EVANSVILLE | ADVERTISING | GRAPHIC EAST | 81708 | 11/27/19 | MUMBO POSTCARD-ONE REFANDCARM SM#1327 FRANCHISE/INSTORE | 15,125 | | 1,496.00 | 24.20 | 69.76 | 1,590.96 |
| 230 | EVANSVILLE | ADVERTISING | GRAPHIC EAST | 81963 | 12/12/19 | DECEMBER 2019 WVENT POSTESS ROUND 2-5VERSIONS GE#61954 | 8 | | 9.96 | 9.23 | 0.60 | 19.85 |
| 230 | EVANSVILLE | ADVERTISING | NTV8 MEDIA, INC | 29327 | 11/22/19 | ART VAN ISSUE DATE: 11/22/19 BLACK FRIDAY PREVIEW | 100 | | | | | 3.83 |
| 230 | EVANSVILLE | ADVERTISING | NTV8 MEDIA, INC | 29344 | 12/13/19 | ART VAN ISSUE DATE: 12/29/19 MATTRESS ONLY 4PG TAB | 100 | | | | | 1.90 |
| 230 | EVANSVILLE | ART VAN | TEMPUS TECHNOLOGIES, INC. | 121944426 | 12/1/19 | COMPLIANCE FEE FOR CC CHIP READER | 1 | 29.00 | 29.00 | | | 29.00 |
| 230 | EVANSVILLE | ADVERTISING | WOLVERINE SOLUTIONS GROUP | 149540 | 10/28/19 | ART VAN TSI OCTOBER 2019 POSTAGE/PROCESSING/DRO | 4 | | | | | 2.00 |

| GRAND TOTAL | 230 | $ | 7,124.20 |
| --- | --- | --- | --- |

Page 1 of 1

Run Date  . . :  10/2020
Run Time  . . :  13:03:26
Store . . . . :  230 EVANSVILLE FR
Page  . . . . :  00001

990708/ACC  RC SRV CD
MAN898R/NEWSYS

ART VAN NITURE
Franchise Service Credits
12/01/2019 to 12/31/2019

| Vendor/Model | Debit Memo# | Service# | Road Service | Delivery Prp | Damage Reprs |
|---|---|---|---|---|---|
| FUL   PO91100 | 230-0000061-001 | | .00 | .00 | 56.25 |
| Total  . . : | | | .00 | .00 | 56.25 |

| Art Van Furniture | | | | |
|---|---|---|---|---|
| Franchising | | | | |
| Commissions billed to Franchise store - Evansville - Store # 230 | | | | |
| December 2019 | | | | |
| | | | | |
| Employee name | Commissions | Spiffs | Total Labor $ | |
| Jamie Froehlich | 105.21 | | 105.21 | |
| | | | | |
| Total | | | 105.21 | |
| | | | | |

Franchise Elite rewards
December 31, 2019

| Orig invoice | Delivered date | Model | Retail Sale | Last cost | Store |
|---|---|---|---|---|---|
| 230-0059070 | 20191204 | AIRFRYER | 50.01 | 50.00 | 230 |
| 230-0059247 | 20191214 | KITCHENAID-MIXER | 200.00 | 200.00 | 230 |
| | | | | 250.00 | |

# **EXHIBIT C**

<table>
<tr><td colspan="2">

**Fill in this information to identify the case:**

Debtor 1   Art Van Furniture, LLC

Debtor 2
(Spouse, if filing)

United States Bankruptcy Court   **District of Delaware**

Case number:  **20–10553**

</td>
<td>

FILED

**U.S. Bankruptcy Court**
**District of Delaware**

6/16/2020

**Una O'Boyle, Clerk**

</td></tr>
</table>

Official Form 410
# Proof of Claim
04/19

**Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.**

**Filers must leave out or redact** information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

**Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy (Form 309) that you received.**

## Part 1:  Identify the Claim

**1. Who is the current creditor?**

Southern Home Furnishings

Name of the current creditor (the person or entity to be paid for this claim)

Other names the creditor used with the debtor

**2. Has this claim been acquired from someone else?**

☑ No
☐ Yes. From whom?

**3. Where should notices and payments to the creditor be sent?**

Federal Rule of Bankruptcy Procedure (FRBP) 2002(g)

| Where should notices to the creditor be sent? | Where should payments to the creditor be sent? (if different) |
|---|---|
| Southern Home Furnishings | Mike McCord |
| Name | Name |
| Michael Busenkell<br>1201 North Orange Street, Suite 300<br>Wilmington, DE 19801 | 10906 Jordain Dr.<br><br>Louisville, KY 19801 |
| Contact phone        302–416–3344 | Contact phone |
| Contact email        mbusenkell@gsbblaw.com | Contact email        mikem@artvanevansville.com |

Uniform claim identifier for electronic payments in chapter 13 (if you use one):

**4. Does this claim amend one already filed?**

☑ No
☐ Yes. Claim number on court claims registry (if known) _____   Filed on _____
MM / DD / YYYY

**5. Do you know if anyone else has filed a proof of claim for this claim?**

☑ No
☐ Yes. Who made the earlier filing?

Official Form 410                           Proof of Claim                           page 1

**Part 2:** **Give Information About the Claim as of the Date the Case Was Filed**

| | |
|---|---|
| **6. Do you have any number you use to identify the debtor?** | ☑ No<br>☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: _____ |

| | |
|---|---|
| **7. How much is the claim?** | $ 0.00      **Does this amount include interest or other charges?**<br>☑ No<br>☐ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A). |

| | |
|---|---|
| **8. What is the basis of the claim?** | Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card. Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).<br>Limit disclosing information that is entitled to privacy, such as healthcare information.<br><br>Damages from breach of Franchise Agreement _____ |

| | |
|---|---|
| **9. Is all or part of the claim secured?** | ☐ No<br>☑ Yes. The claim is secured by a lien on property.<br>    **Nature of property:**<br>    ☐ Real estate.   If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410–A) with this *Proof of Claim.*<br>    ☐ Motor vehicle<br>    ☑ Other. Describe:    secured to the extent of setoff _____<br><br>    **Basis for perfection:**    see other _____<br><br>    Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)<br><br>    **Value of property:**    $ _____<br>    **Amount of the claim that is secured:**    $   0.00 _____<br>    **Amount of the claim that is unsecured:**    $   0.00 _____ (The sum of the secured and unsecured amounts should match the amount in line 7.)<br><br>    **Amount necessary to cure any default as of the date of the petition:**    $ _____<br><br>    **Annual Interest Rate** (when case was filed)    0.00    %<br><br>    ☑ Fixed<br>    ☐ Variable |

| | |
|---|---|
| **10. Is this claim based on a lease?** | ☑ No<br>☐ Yes. **Amount necessary to cure any default as of the date of the petition.** $ _____ |

| | |
|---|---|
| **11. Is this claim subject to a right of setoff?** | ☑ No<br>☐ Yes. Identify the property: _____ |

| 12. | Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)? | ☑ No |
|---|---|---|

☐ Yes. *Check all that apply*:

**Amount entitled to priority**

A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority.

☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B).  $ _____

☐ Up to $3,025* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7).  $ _____

☐ Wages, salaries, or commissions (up to $13,650*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4).  $ _____

☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8).  $ _____

☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5).  $ _____

☐ Other. Specify subsection of 11 U.S.C. § 507(a)(_) that applies  $ _____

\* Amounts are subject to adjustment on 4/1/22 and every 3 years after that for cases begun on or after the date of adjustment.

## Part 3: Sign Below

**The person completing this proof of claim must sign and date it. FRBP 9011(b).**

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

**A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157 and 3571.**

Check the appropriate box:

☑ I am the creditor.

☐ I am the creditor's attorney or authorized agent.

☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.

☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this Proof of Claim serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this Proof of Claim and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date    6/16/2020

MM / DD / YYYY

/s/  Mike McCord

Signature

Print the name of the person who is completing and signing this claim:

Name    Mike McCord

First name    Middle name    Last name

Title

Company    Southern Home Furnishings LLC

Identify the corporate servicer as the company if the authorized agent is a servicer

Address    10906 Jordain Drive

Number   Street
Louisville, KY 40241

City   State   ZIP Code

Contact phone    _____    Email    mikem@artvanevansville.com

## ADDENDUM TO PROOF OF CLAIM

### I.    NOTICE RESPECTING THIS CLAIM

In addition to the name and address provided on the attached Proof of Claim form, all notices with respect to any claim of Southern Homes Furnishings LLC ("Claimant") must be served upon the following:

| | |
|---|---|
| Gellert Scali Busenkell & Brown, LLC | Southern Homes Furnishings LLC |
| Attn: Michael Busenkell, Esq. | Attn: Mike McCord |
| 1201 N. Orange Street, Ste. 300 | 10906 Jordain Drive |
| Wilmington, DE  19801 | Louisville, KY  40241 |

### II.    NATURE OF CLAIM

Claimant asserts a claim ("Claim") against the Debtors, Art Van Furniture, LLC, *et al.* (the "Debtors"), in an unliquidated amount based on rejection of that certain franchise agreement dated April 18, 2018 (the "Franchise Agreement") as memorialized in the contract attached hereto as **Exhibit A**.  In rejecting the Franchise Agreement, Claimant has incurred damages based on the Debtors' failure to adhere to their requirements under the Franchise Agreement, including providing advertising and other services to assist the Claimant as it endeavored to become profitable.

By filing this Proof of Claim, Claimant reserves all rights against the Debtors.  Among other things, Claimant preserves any and all rights they have to taxes, fees, expenses, costs, damages and/or other charges owed.  Nothing in this Addendum or the accompanying Proof of Claim limits Claimant's rights.

### III.    CLASSIFICATION OF CLAIMS

Claimant's Claim is a general unsecured claim for the damages resulting from breach of contract by virtue of the rejection of the Franchise Agreement; however, it is secured to the extent of setoff.

### IV.    SUPPORTING DOCUMENTS

The documents upon which the Claim is based include, among other things, the Franchise Agreement attached as **Exhibit A**.

### V.    NO SETOFF

To the best of Claimant's knowledge, the claim set forth in this Proof of Claim is not subject to any valid setoff or counterclaim by the Debtors; *provided, however,* that any setoff or recoupment rights that the Claimant may possess are expressly reserved and are not waived.

## VI.    ADMINISTRATIVE EXPENSE CLAIMS

This Proof of Claim is without prejudice to other claims, if any, that the Claimant has or may have for payment of any administrative expense allowable under Section 503(b) of the Bankruptcy Code or otherwise with respect to any transaction, whether or not such amounts are included in this Proof of Claim, and the right to file such claim or any similar claim at an appropriate time is expressly reserved.

## VII.    ADDITIONAL PROOFS OF CLAIM

This Proof of Claim is filed without prejudice to the filing by, or on behalf of, the Claimant of additional proofs of claim with respect to any other liability or indebtedness of the Debtors.  All procedural and substantive defenses and rights with respect to any claim that may be asserted against the Claimant by the Debtors or any other party in interest in these bankruptcy cases or otherwise, or by any other person or entity whatsoever, are specifically preserved.

## VIII.    NO WAIVER

Filing of this Proof of Claim is not and should not be construed to be: (a) a waiver or release of the Claimant's rights against any other entity or person liable for all or part of any claim described herein; (b) a waiver of the right to seek to have the reference withdraw with respect to (i) the subject matter of these claims, (ii) any objection or other proceedings commenced with respect thereto, or (iii) any other proceedings commenced in these cases against or otherwise involving the Claimant; (c) a waiver of any right to the subordination, in favor of the Claimant, of indebtedness or liens held by creditors of the Debtors; or (d) an election of remedy which waives or otherwise affects any other remedy of the Claimant.

## IX.    RESERVATION OF RIGHTS

This Proof of Claim is filed with full reservation of rights, including the right to assert additional, supplementary and/or amended proofs of claim and requests for administrative expense reimbursements based on events, information and/or documents obtained from the Debtors or others through discovery or otherwise. Without in any way limiting the foregoing, the Claimant's rights to assert any claim they may have against the Debtors, or against any other party or property other than the Debtors and their estates, are expressly reserved. This Proof of Claim is conditional only and is not intended, nor should it be construed as the Claimant's consent to jurisdiction in the District of Delaware, or as a waiver of the Claimant's right to a trial by jury in any action or proceeding.

# EXHIBIT A

# FRANCHISE AGREEMENT

BETWEEN

## AVF FRANCHISING, LLC

AND

## SOUTHERN HOME FURNISHINGS, LLC
("Franchisee")

EFFECTIVE DATE:  April $\underline{18}$ , 2018

LOCATION: 5480 East Indiana St.
Evansville, Indiana

# TABLE OF CONTENTS

Article 1 - Introduction ...................................................................................................1
1.1      Franchise System. ..................................................................................... 1
1.2      Franchise Marks. ...................................................................................... 1
1.3      Acknowledgements of Franchisee. ......................................................... 1
Article 2 - Grant of Franchise ..........................................................................................2
2.1      Grant of Franchise. ................................................................................... 2
2.2      Limitations. ............................................................................................... 2
2.3      Limited Exclusivity. ................................................................................. 2
2.4      Reservation of Rights. .............................................................................. 3
Article 3 - Term and Option.............................................................................................3
3.1      Term. ........................................................................................................ 3
3.2      Option of Franchisee. ............................................................................... 3
Article 4 - Fees, Reports, Access and Audit ....................................................................5
4.1      Initial Franchise Fee. ............................................................................... 5
4.2      Royalty. .................................................................................................... 5
4.3      Grand Opening Advertising; Marketing Fund Contributions; Local Area Advertising Program. ................................................................................ 6
4.4      Training Fees. ........................................................................................... 6
4.5      Renewal Fee. ............................................................................................ 6
4.6      Transfer Fee. ............................................................................................ 6
4.7      Late Charge; NSF Fees; Interest. ............................................................ 6
4.8      Manner of Payment. ................................................................................. 7
4.9      No Setoff; Application of Payments. ....................................................... 7
4.10    Reports and Financial Statements. ........................................................... 7
4.11    Point of Sale and Computer Equipment and Software; Access to and Use of Information. .............................................................................................. 8
4.12    Records. ................................................................................................... 8
4.13    Inspection by FRANCHISOR. ................................................................ 9
4.14    Access to Records and Audit by FRANCHISOR. ................................... 9
4.15    Security Agreement; UCC-1 Filing; Letter of Credit ............................. 9
4.16    Product Delivery Fees. ........................................................................... 10
4.17    Warranty Administration Fees. .............................................................. 10
4.18    Warehouse Landing Fees. ...................................................................... 10
4.19    Internet Sales Processing Fees ............................................................... 10
Article 5 - Services Provided to Franchisee ...................................................................11
5.1      Site Selection and Lease Negotiation. ................................................... 11
5.2      Construction and Improvements. ........................................................... 11
5.3      Equipment, Fixtures, Signs, Inventory and Suppliers. .......................... 11
5.4      Operations Manual; Update Specifications. .......................................... 11
5.5      Training. ................................................................................................. 11
5.6      Computer Equipment and Software: ...................................................... 11
5.7      Products and Services; Suppliers; Warranties. ...................................... 11
5.8      Operational Assistance. ......................................................................... 11
5.9      Pricing. ................................................................................................... 12

| | | |
|---|---|---|
| 5.10 | Advertising. | 12 |
| 5.11 | FRANCHISOR's Services May be Provided by Independent Agents and Representatives. | 12 |
| 5.12 | Consultation. | 12 |
| 5.13 | Reporting System. | 12 |
| 5.14 | Bulletins. | 12 |
| 5.15 | Internet Sale Referrals. | 12 |
| **Article 6 - Use and Protection of Franchise Marks** | | **13** |
| 6.1 | Non-ownership of Franchise Marks. | 13 |
| 6.2 | Use of Franchise Marks. | 13 |
| 6.3 | Use of Other Trademarks. | 13 |
| 6.4 | Defense of Franchise Marks. | 14 |
| 6.5 | Prosecution of Infringers. | 14 |
| 6.6 | Modification or Substitution of Franchise Marks. | 14 |
| 6.7 | Validity and Ownership of Franchise Marks; Prohibition Against Disputing FRANCHISOR's Rights. | 14 |
| **Article 7 - Franchise Location, Lease and other Pre-Opening Obligations** | | **15** |
| 7.1 | Location Selection and Approval. | 15 |
| 7.2 | Lease Requirements. | 15 |
| 7.3 | Licenses and Permits. | 16 |
| 7.4 | Completion of Training. | 16 |
| 7.5 | Development of Franchise Business and Franchise Location. | 16 |
| 7.6 | Telephone Numbers; Internet Access; E-mail Addresses. | 17 |
| **Article 8 - Operations** | | **17** |
| 8.1 | Opening Date; Continuing Operations and Best Efforts. | 18 |
| 8.2 | Standards of Operation; Operations Manual. | 18 |
| 8.3 | Acquisition of Products and Services. | 19 |
| 8.4 | Specifications and Approved Suppliers for Products and Services. | 19 |
| 8.5 | Products and Services Offered by the Franchise Business; Pricing; Promotional Programs. | 20 |
| 8.6 | Maintenance; Refurbishing; Alterations. | 21 |
| 8.7 | Designated Owners; Managers. | 22 |
| 8.8 | Employees. | 22 |
| 8.9 | Insurance. | 22 |
| 8.10 | Compliance with Laws and Other Obligations. | 23 |
| 8.11 | Separate Identification of Franchise Business. | 24 |
| 8.12 | Indemnification. | 24 |
| 8.13 | Participation in Franchisee Advisory and other Committees. | 24 |
| 8.14 | Notices to FRANCHISOR. | 24 |
| 8.15 | Minimum Annual Sales Volume and Net Operating Income. | 25 |
| **Article 9 – Advertising** | | **25** |
| 9.1 | Grand Opening Advertising. | 25 |
| 9.2 | Marketing Fund. | 25 |
| 9.3 | Local Advertising. | 26 |
| 9.4 | Additional Advertising; Approval of Advertising Materials. | 26 |
| 9.5 | Use of Internet, Websites, Catalogues or Toll-Free Telephone Numbers. | 27 |
| 9.6 | Cooperative Advertising | 28 |
| **Article 10 – Training** | | **29** |

| | | |
|---|---|---:|
| 10.1 | Initial Training. | 29 |
| 10.2 | Franchisee's Training Program. | 29 |
| 10.3 | Additional Training, Sales Programs and Meetings. | 29 |
| Article 11 - Confidential Information | | 30 |
| 11.1 | Confidential Information Defined. | 30 |
| 11.2 | Ownership and Use of Confidential Information. | 30 |
| 11.3 | Development of New Proprietary or Confidential Information. | 31 |
| 11.4 | Expiration, Termination or Transfer of this Agreement. | 31 |
| Article 12 – Restrictions on Competition | | 31 |
| 12.1 | Covenant Not to Compete During Term. | 31 |
| 12.2 | Other Restrictions During Term. | 32 |
| 12.3 | Definition of Competing Business. | 32 |
| 12.4 | Acknowledgements and Agreements Relating to Restrictions on Competition. | 32 |
| 12.5 | Covenant Not to Compete After Termination or Expiration of Franchise Term. | 32 |
| Article 13 - Transferability | | 33 |
| 13.1 | General Rule. | 33 |
| 13.2 | Conditions of FRANCHISOR'S Consent to Transfer; Right of First Refusal. | 33 |
| 13.3 | Transfer on Death or Incapacity. | 35 |
| 13.4 | Transfers to Controlled Entities or Trust. | 35 |
| 13.5 | Assignment by FRANCHISOR. | 36 |
| Article 14 – Default and Termination | | 36 |
| 14.1 | Default by FRANCHISOR: Termination by Franchisee. | 36 |
| 14.2 | Default by Franchisee: Termination by FRANCHISOR. | 36 |
| 14.3 | Events of Default by Franchisee: No Right to Cure. | 36 |
| 14.4 | Events of Default by Franchisee: Right to Cure. | 38 |
| 14.5 | Right to Withhold Products and Support Services on Certain Defaults by Franchisee; Return of Unpaid Product. | 39 |
| Article 15 - Effect of Termination or Expiration | | 39 |
| 15.1 | Obligations of Franchisee. | 39 |
| 15.2 | Option to Assume Lease. | 40 |
| 15.3 | Option to Purchase Assets: | 41 |
| 15.4 | Surviving Obligations. | 41 |
| 15.5 | Damages for Loss of Bargain. | 41 |
| 15.6 | Remedies. | 42 |
| Article 16 – Dispute Resolution; Law and Jurisdiction; Injunctive Relief; Costs of Enforcement; Jury Waiver; Limitations of Claims | | 42 |
| 16.1 | Negotiation. | 42 |
| 16.2 | Binding Arbitration. | 42 |
| 16.3 | Arbitration Procedures. | 42 |
| 16.4 | Decision of Arbitrator. | 43 |
| 16.5 | Applicable Law. | 43 |
| 16.6 | Injunctive Relief; Venue | 43 |
| 16.7 | Costs of Enforcement. | 44 |
| 16.8 | Jury Waiver; Time Period for Bringing Claims; Limitation of Damages. | 44 |
| 16.9 | Survival. | 45 |
| Article 17 – Additional Provisions | | 45 |
| 17.1 | Independent Contractor. | 45 |
| 17.2 | Waivers. | 46 |

| 17.3 | Consents, Approvals and Satisfaction. | 46 |
| 17.4 | Third Parties. | 47 |
| 17.5 | Cumulative Remedies. | 47 |
| 17.6 | Notices. | 47 |
| 17.7 | Unavoidable Contingencies. | 47 |
| 17.8 | Entire Agreement; Modifications. | 47 |
| 17.9 | Severability. | 48 |
| 17.10 | Uniformity. | 48 |
| 17.11 | Obligations Joint and Several. | 48 |
| 17.12 | Signing by FRANCHISOR. | 48 |
| 17.13 | Ownership of Franchisee. | 48 |
| 17.14 | Headings. | 48 |
| 17.15 | No Class Action or Consolidation. | 48 |
| Article 18 – Representations and Acknowledgements | | 48 |
| 18.1 | No Authority. | 48 |
| 18.2 | Receipt. | 49 |
| 18.3 | Opportunity for Review by Franchisee's Advisors. | 49 |
| 18.4 | Execution of Agreement. | 49 |
| 18.5 | Independent Investigation. | 49 |
| 18.6 | Reliance. | 50 |

# AVF FRANCHISING, LLC
## FRANCHISE AGREEMENT

THIS AGREEMENT is made this __18__ day of April, 2018, between AVF FRANCHISING, LLC, a Michigan limited liability company ("FRANCHISOR" or "AVF") and SOUTHERN HOME FURNISHINGS, LLC, a Kentucky limited liability company ("Franchisee" or "You").

# Article 1 - Introduction

### 1.1    Franchise System.

FRANCHISOR franchises a system for operation of AVF stores that will market and sell to the general public home and office furniture, mattresses, flooring, window treatments, electronics, appliances and other related items under the AVF licensed Franchise Marks and franchise system ("AVF Products"). The typical Furniture Store franchise will not only offer the complete line of AVF Products, but will contain an in-store clearance center, and an in-store Pure Sleep Gallery.

Franchise Stores will include uniform interior and exterior designs and colors with use of FRANCHISOR's proprietary name and logo. Franchisee will operate its franchise under uniform and distinctive methods, plans, standards, specifications and systems, as periodically modified by AVF ("AVF System" or the "Franchise System"). The system may be updated and revised by FRANCHISOR in the future. The franchise operated by you under this Agreement will sometimes be referred to as the "Franchise Business" or the "Store."

### 1.2    Franchise Marks.

FRANCHISOR uses and owns or has rights to certain trademarks, service marks, logos, trade dress and other elements that are used to identify the Franchise System and Store. FRANCHISOR obtained its rights in the Franchise Marks and the right to license others to use the Franchise Marks from its affiliate, Art Van Furniture, LLC though a license agreement. FRANCHISOR's rights under the license agreement are in perpetuity. FRANCHISOR may, in the future, obtain rights in, develop, use and/or register additional or different trademarks, service marks, logos, trade dress and other elements that it may make available for use by Franchisee. The trademarks, service marks, logos, trade dress and other elements that FRANCHISOR authorizes Franchisee to use now and in the future will be referred to in this Agreement as the "Franchise Marks."

### 1.3    Acknowledgements of Franchisee.

Franchisee recognizes the advantages of operating under the Franchise System and Franchise Marks and desires to obtain the right to operate a Store.

Franchisee acknowledges that it received FRANCHISOR's Franchise Disclosure Document at least 14 calendar days before signing this Agreement or paying any consideration to FRANCHISOR. Franchisee acknowledges that it has read and understood this Agreement, the attachments to this Agreement, and the documents relating to this Agreement, if any, and has been given ample time and opportunity to consult with an attorney or other professional advisor about the potential benefits and risks of entering into this Agreement.

Franchisee understands the risks of being involved in a retail Store business and is able to bear such risks. Franchisee also acknowledges that the success of the Franchise Business depends primarily on Franchisee's efforts. In addition, other factors beyond the control of FRANCHISOR or Franchisee may affect the success of Franchisee's business, including competition, economic conditions, business trends, costs, market conditions, and other conditions that may be difficult to anticipate, assess or even identify.

Franchisee acknowledges that neither FRANCHISOR, nor any of their agents or representatives have made or are authorized to make any oral, written or visual representations or projections of actual or potential sales, earnings, net or gross profits, operational costs or expenses, prospects or chances of success that are not contained in this Agreement, or in FRANCHISOR's Franchise Disclosure Document. Franchisee agrees that it has not relied on and that FRANCHISOR will not be bound by allegations of any representations as to earnings, sales, profits, costs, expenses, prospects or chances of success that are not contained in this Agreement, or in FRANCHISOR's Franchise Disclosure Document. Franchisee understands and acknowledges that the Franchise Business may lose money or fail.

## Article 2 - Grant of Franchise

### 2.1    Grant of Franchise.
FRANCHISOR grants to Franchisee the nonexclusive right to use the Franchise Marks and the Franchise System in connection with the operation of a single Store in accordance with this Agreement and FRANCHISOR's Operations Manual (as defined in Section 8.3). The Franchise Business must be operated at the location designated in Item 1 of Appendix A or at the location designated in accordance with Section 7.1 of this Agreement (the designated location is referred to as the "Franchise Location").

### 2.2    Limitations.
The rights granted to Franchisee in this Agreement relate only to the sale of AVF Products at the Franchise Location, and no exclusive area or other territorial rights are granted to Franchisee, except as specifically provided in Section 2.3 below.

### 2.3    Limited Exclusivity.
Except as otherwise provided in this Agreement, as long as this Agreement is in effect and Franchisee is not in default under this Agreement, FRANCHISOR will not operate or authorize any other person to operate a business using the Franchise Marks or the Franchise System in the "Protected Territory" as defined in this Section. Franchisee shall receive a Protected Territory as described in Appendix A.

FRANCHISOR may operate and authorize others to operate a business that offers the same or similar products and services as a Store in the Protected Territory under trademarks different from the Franchise Marks.

Franchisee's limited rights as stated in this Section relate to location only and do not grant Franchisee any exclusivity of marketing or customers. All Stores may sell their products and services to any customer. However, you will have no right to solicit or conduct business through the use of

toll free telephone numbers, catalogs, direct mail, internet or other advertising or solicitation methods without FRANCHISOR's prior written approval.

**2.4     Reservation of Rights.**
         All rights not expressly granted in this Agreement to Franchisee relating to the Franchise Marks and Franchise System are reserved to FRANCHISOR, including but not limited to: (a) the right to operate and authorize others to operate businesses using the Franchise Marks and/or Franchise System at any location other than a location in the Protected Territory; (b) the right to use or authorize others to use the Franchise Marks and/or Franchise System, or any other trademarks or systems, in connection with the manufacture and sale of products at wholesale or retail, through the use of toll free telephone numbers, catalogs, direct mail, over the Internet or through any distribution channels (including operations within the Protected Territory) other than the operation of a retail Store business operated under the Franchise Marks and Franchise System within the Protected Territory; and (c) the right to operate or authorize others to operate any business that does not use the Franchise Marks or the Franchise System at any location, including locations within the Protected Territory, including without limitation, an "Art Van Pure Sleep," or "Pure Sleep."

         FRANCHISOR reserves all right to retain sales made through alternate channels of distribution, including, without limitation, internet, toll free numbers, catalogs, or direct mail companies.

## Article 3 - Term and Option

**3.1     Term.**
         This Agreement will begin on the date of this Agreement and continue for ten (10) years from the date of this Agreement unless sooner terminated as provided in this Agreement.

**3.2     Option of Franchisee.**
         Franchisee will have the option to remain a Franchisee for one (1) period of ten (10) years, if, at the beginning of each option period, all of the following conditions are fulfilled:

         (a)     Franchisee is not in default of this Agreement or any other agreement between the parties and no affiliate of Franchisee is in default under any agreement between the affiliate and FRANCHISOR.

         (b)     Franchisee, during the past twelve (12) months, has not received from FRANCHISOR two (2) or more notices of default of the terms of this Agreement or any specification, standard or operating procedure of FRANCHISOR (whether or not such notices related to the same or different violations and whether or not those violations have been remedied by Franchisee).

         (c)     Franchisee provides written notice of its intent to continue as a franchisee not more than twelve (12) months and not less than six (6) months before the beginning of the option period.

         (d)     Franchisee is able to maintain possession of the Franchise Location for the remainder of the renewal term and agrees to refurbish the Franchise Location in compliance

with the then applicable standards of FRANCHISOR for its type of Store. Alternatively, Franchisee must be able to secure for the remainder of the renewal term and develop, in compliance with the then applicable standards of FRANCHISOR used in the granting of a franchise, suitable alternative premises for the Franchise Business. Any alternative premises must be acceptable to and approved in advance by FRANCHISOR.

(e)     Franchisee, throughout the term of this Agreement, has satisfied all material reporting requirements and all monetary obligations to FRANCHISOR and any affiliates of FRANCHISOR, suppliers and creditors (excepting reasonable disputes that Franchisee is attempting in good faith to resolve) within the amount of time specified for satisfaction or cure of default with respect to such obligation.

(f)     Franchisee has satisfied any additional training requirements for new or existing franchisees of FRANCHISOR.

(g)     Franchisee has signed a general release, in a form specified by FRANCHISOR, of any and all claims against FRANCHISOR, its subsidiaries and affiliates, and their respective officers, directors, agents, members and employees.

(h)     Franchisee has signed and delivered to FRANCHISOR, within thirty (30) days of receipt from FRANCHISOR, the then-current standard franchise agreement in use by FRANCHISOR at the time of renewal together with such other documents as are then customarily used by FRANCHISOR to grant new franchises, all of which will replace this Agreement.   The new standard franchise agreement signed by Franchisee may have substantial differences from this Agreement, including, without limitation, different or increased fees.

(i)     Franchisee must pay a renewal fee to exercise its option. The renewal fee of Twenty Five percent (25%) of our then-current initial franchise fee (excluding initial floor sample inventory) will be charged by FRANCHISOR at the time of renewal. This fee must be paid at the time the new standard franchise agreement is delivered to FRANCHISOR.

(j)     FRANCHISOR has approved the renewal of the franchise. If all of the other conditions in this Section are met, FRANCHISOR will not withhold approval of renewal except for good cause.

Failure or refusal by Franchisee to sign the franchise agreement and other documents and pay the renewal fee within thirty (30) days after delivery of the franchise agreement and other documents to Franchisee, when FRANCHISOR approves renewal of the franchise, will be deemed an election by Franchisee not to renew the franchise. If Franchisee does not elect to renew its franchise relationship, does not qualify for renewal or does not comply with the requirements for renewal specified above, the franchise relationship between FRANCHISOR and Franchisee will automatically terminate on completion of the term set forth in this Agreement.

# Article 4 - Fees, Reports, Access and Audit

### 4.1    Initial Franchise Fee.

An initial franchise fee in the amount of Fifty Thousand Dollars ($50,000), shall be paid by Franchisee upon the execution of this Agreement.

## Initial Franchise Fee Debt Forgiveness

At the sole option of AVF, franchisees may be offered the opportunity to pay the one-half (1/2) of initial franchise fee to AVF through execution of a forgivable five (5) year promissory note in the amount of Twenty-five Thousand Dollars ($25,000), including interest at the federal prime rate plus 2% (the "Franchise Fee Debt"). A copy of the promissory note is set forth as Appendix D-1 to this Agreement. The Franchise Fee Debt and applicable interest will then be forgiven or reduced at the rate of twenty per cent (20%) per year provided that Franchisee complies with the following criteria: (i) proof of build out or remodeling expenditures pursuant to AVF standards and criteria is provided to AVF; (ii) Franchisee has remained current in all obligations owing under the Franchise Agreement; (iii) Franchisee has completed grand opening within 90 days of conversion; and (iv) Franchisee has attended all annual conventions. The Note provides that if these conditions are not met, the balance of the initial franchise fee less credits earned will be due to AVF.

If this Agreement is being signed by Franchisee to comply with an Area Development Agreement, the Franchisee will receive a credit of Ten Thousand Dollars ($10,000) against the initial franchise fee owing under this Agreement. All initial franchise fees are payable in full at the time of signing of this Agreement. The initial franchise fee is considered earned at the time of signing of this Agreement and is not refundable.

### 4.2    Royalty.

Franchisee must pay FRANCHISOR a weekly royalty of 5% on all Gross Sales, which must be reported and paid, in the manner specified in Section 4.8 below, on or before Wednesday of each week based on Gross Sales for the preceding week. Royalty fees are not refundable.

For purposes of this Agreement, "Gross Sales" means the entire amount of all of Franchisee's revenues from the ownership or operation of the Franchise Business including the proceeds of any business interruption insurance, whether the revenues are evidenced by cash, credit, checks, gift certificates, coupons and premiums (unless exempted by FRANCHISOR), services, property or other means of exchange, excepting only the amount of any sales taxes that are collected and paid to the taxing authority. Cash refunded and credit given to customers and receivables uncollectible from customers will be deducted in computing Gross Sales if the cash, credit or receivables represent amounts previously included in Gross Sales were royalty fees and advertising contributions previously paid. Gross Sales are deemed received by the Franchisee at the time the goods, products, merchandise, or services from which they derive are delivered or rendered or at the time the relevant sale takes place, whichever occurs first. Gross Sales consisting of property or services (for example, "bartering" or "trade outs") are valued at the prices applicable to the products or services exchanged for the Gross Sales at the time the Gross Sales are received.

### 4.3    Grand Opening Advertising; Marketing Fund Contributions; Local Area Advertising Program.

Franchisee must spend not less than $10,000, to be used for grand opening advertising for the Franchise Business in accordance with Section 9.1 of this Agreement. The specified amount must be paid to vendors at least 60 days before the earlier of: (a) the actual date of opening of the Franchise Business; or (b) the designated opening date of the Franchise Business.

Franchisee shall also pay an amount equal to 1% of Franchisee's Gross Sales to a marketing fund that will be administered by Franchisor or an agency Franchisor designate. See Section 9.2. Franchisee must also spend each month for local advertising an amount that is not less than 3% of Gross Sales.

### 4.4    Training Fees.

Training fees are not charged by FRANCHISOR for the initial training program (see Section 10.1). Additional training requested by Franchisee will be solely at Franchisee's expense. That expense will include reimbursement for the costs of materials, travel (if any), and a reasonable per diem charge to cover FRANCHISOR's personnel costs. Also, FRANCHISOR may require Franchisee to attend additional training at Franchisee's expense.

FRANCHISOR provides and pays for the instructors, training facilities, and training materials utilized in training for the first two persons designated by Franchisee to attend the initial training program. Franchisee must pay the training fees periodically establish for any other persons to attend the initial training program or any subsequent training program. These fees may be announced through bulletins, manuals or other written notices. If Franchisee requires additional on-site business coaching and assistance beyond that provided under this Agreement, the cost will be as charged in the manual, bulletins or written notices (which may be revised from time to time).

### 4.5    Renewal Fee.

Franchisee must pay a renewal fee if Franchisee elects to renew its franchise at the end of the initial term of the franchise. The renewal fee is Twenty-Five percent (25%) of our then-current initial franchise fee (excluding initial floor sample inventory). See Section 3.2(i).

### 4.6    Transfer Fee.

A transfer fee is payable on a transfer of the Franchise Business. The transfer fee is $10,000 plus any broker fees charged. See Section 13.2(f).

### 4.7    Late Charge; NSF Fees; Interest.

Franchisee must pay to FRANCHISOR, on demand, a late charge of $100 for any payments not made to FRANCHISOR within five days of the due date of the payment. In addition, Franchisee must pay on demand a fee equal to any charges FRANCHISOR may incur as a result of checks or debits returned to FRANCHISOR for non-sufficient funds or other similar reasons ("NSF fees"), but not less than $30.00 for each item returned. Also, Franchisee must pay to FRANCHISOR, on demand, interest on all overdue payments from the date the payment was due until paid equal to the lesser of: (i) the prime federal rate plus 3% per month or (ii) the maximum rate of interest permitted by law. The assessment of late charges, NSF fees and interest will not be the sole remedies of FRANCHISOR in such circumstances.

### 4.8    Manner of Payment.

Franchisee must pay royalty and Marketing Fund contributions and any other periodic payments to FRANCHISOR by electronic or similar funds transfer in the appropriate amounts from Franchisee's primary operating bank account to such accounts, and at such places or in such manner as FRANCHISOR may specify from time to time. Franchisee's primary operating bank account means the account in which all revenue of the Franchise Business is deposited and held to pay amounts owed to AVF and other creditors of the Franchise Business. Franchisee must sign and deliver to its bank and to FRANCHISOR those documents necessary to authorize and effectuate the transfers as specified by FRANCHISOR. Franchisee must not terminate this authorization as long as this Agreement is in effect. Franchisee must not close its primary operating bank account without prior written notice to FRANCHISOR and the establishment of a substitute primary operating bank account for the transfers. Franchisee represents and warrants to FRANCHISOR that it will have sufficient funds in its primary operating bank account from time to time to cover payment of all amounts due to FRANCHISOR or its affiliates on a timely basis.

### 4.9    No Setoff; Application of Payments.

Franchisee's obligations for the full and timely payment of the fees described in this Agreement are absolute and unconditional. Franchisee must not delay or withhold the payment of all or part of those fees based on the alleged nonperformance by FRANCHISOR or for any other reason or put the fees in escrow or setoff against any claims Franchisee may allege against FRANCHISOR. FRANCHISOR may apply any payments received first to any accrued late charges or interest and then to any delinquent fees or other amounts outstanding before crediting the payment in the manner specified by Franchisee or to the current amount due.

### 4.10    Reports and Financial Statements.

Franchisee must use the standard reporting system and forms specified by FRANCHISOR. Franchisee must submit to FRANCHISOR a complete statement of Gross Sales and other information specified by FRANCHISOR for the reporting periods and on the forms specified by FRANCHISOR. Franchisee must provide FRANCHISOR with copies of all sales or similar tax returns, annual income tax returns, monthly profit and loss statements, monthly balance sheets, monthly inventory statements and annual financial statements. Copies of monthly statements or reports must be provided within 30 days of the end of each month and copies of annual statements or reports must be provided within 60 days of the end of Franchisee's fiscal year. FRANCHISOR may specify other requirements relating to reporting in the Operations Manual.

FRANCHISOR may receive information directly from suppliers and Franchisee authorizes Franchisee's suppliers to provide information directly to FRANCHISOR. Franchisee agrees to sign separate authorizations or additional documents requested by suppliers or deemed necessary by FRANCHISOR to obtain information directly from suppliers.

The financial records of Franchisee may be disclosed by FRANCHISOR in future Franchise Disclosure Documents which may identify the individual Store for which a particular franchisee's financial records relate, and to FRANCHISOR's actual and potential lenders.

**4.11   Point of Sale and Computer Equipment and Software; Access to and Use of Information.**

Franchisee must at all times use FRANCHISOR's proprietary accounting software system or other accounting software designated by FRANCHISOR. Franchisee must also have working knowledge and training satisfactory to FRANCHISOR of QuickBooks accounting software. If Franchisee is a conversion franchisee, such transition must occur no later than 60 days from beginning operation as an AVF Franchisee. Franchisee must also purchase a point of sale ("POS") system for use in the Franchise Business. The POS system will be a network of registers, computers, software, phones and wiring system.  The number of components necessary will depend on the size of the Store, but will include POS terminals, printers, bar code scanners, cash drawers, credit card readers, routers, an uninterruptible power supply, bar code label printers, printer/copier/fax/scanner, back office computers, POS programming, POS software licensing and terminal services.  Franchisee must also pay all support, maintenance, update and upgrade costs to maintain the specified POS and computer systems in the manner specified by FRANCHISOR.  FRANCHISOR may develop, acquire, update or modify a POS and computer system and specifications for certain components of the POS and computer systems in the future.  As part of the POS and computer systems, FRANCHISOR may require Franchisee to obtain specified computer hardware and software including, without limitation, a license to use proprietary software developed by us or others and service agreements.  Modification of the specifications for the components of the POS and computer systems may require you to incur costs to purchase, lease or license new or modified computer hardware and software and to obtain service and support for the POS and computer system during the term of this Agreement.  Within 90 days after you receive notice from FRANCHISOR, Franchisee must obtain and have operational the components of the POS and computer system that AVF specifies.

Franchisor shall have the right to independently access the sales information and other data produced by the POS, accounting system and other computer systems.  Franchisee must provide us access to the information on the POS and computer systems in the manner specified by us and must supply FRANCHISOR with any security codes necessary to obtain that access.  FRANCHISOR may retrieve, analyze, download and use the software and all data on your POS and computer systems at any reasonable times as long as the access does not unreasonably interfere with the operation of the Franchise Business.

The required computer hardware and software will also collect and make available to Franchisee and FRANCHISOR information about the Franchise Business, including purchases, customer data, inventory, receipts, cost of goods, profitability and expenses.

FRANCHISOR has no obligation to provide support for required hardware or software programs that are purchased from or that are supplied by third-party vendors.  FRANCHISOR has no contract with any hardware manufacturer to provide Franchisee with service or support, and does not represent that it has knowledge as to the cost of updates and upgrades. There is no limit to the frequency with which Franchisee may require them or the amount of the cost.  Those factors are determined by computer hardware and software manufacturer pricing and service policies.

**4.12   Records.**

Franchisee must keep complete and correct books of account, business records and records of Gross Sales, in accordance with the procedures specified by FRANCHISOR and in accordance

with generally accepted accounting principles. Franchisee must keep all of its business records for a minimum of seven (7) years.

### 4.13   Inspection by FRANCHISOR.

To determine whether Franchisee is complying with this Agreement, and/or to determine whether Franchisee is complying with all applicable specifications and quality standards in connection with Franchisee's use of the Franchise Marks and Franchise System, FRANCHISOR or its designated representatives have the right, at any reasonable time and without prior notice, to: (a) inspect the Franchise Business; (b) confer with Franchisee and its employees; and (c) inspect equipment, signage, fixtures, furniture, inventory, products and operating methods of Franchisee. FRANCHISOR may require that Franchisee furnish its customers with an evaluation form specified by FRANCHISOR pre-addressed to FRANCHISOR. Also, FRANCHISOR may require that Franchisee maintain a comment box at the Franchise Location, which may only be opened by FRANCHISOR. Franchisee must fully cooperate with representatives of FRANCHISOR making any inspection or observing the work of Franchisee or its employees or retrieving information from the comment box.

### 4.14   Access to Records and Audit by FRANCHISOR.

FRANCHISOR or its designated representatives have the right at all reasonable times to examine and copy the books, records and tax returns of Franchisee. FRANCHISOR will also have the right, on five days written notice, to have an audit made of the books of Franchisee. If an audit reveals that any payments to FRANCHISOR have been understated in any report to FRANCHISOR, Franchisee must immediately pay to FRANCHISOR the amount understated on demand, in addition to interest at the prime federal rate plus 3% and late charges required under Section 4.7 of this Agreement, from the date originally due to the date paid.

Any audit will be conducted at the expense of FRANCHISOR. However, if an audit is made necessary by Franchisee's failure to furnish reports, financial statements, or tax returns, or discloses an understatement of 2% or more of the Gross Sales of the Franchise Business in any report, then FRANCHISOR has the right to charge Franchisee for the costs of the audit, including, without limitation, any travel expenses, meals, lodging and compensation of FRANCHISOR's employees or agents and reasonable accounting and attorney's fees.

Nothing contained in this Section constitutes FRANCHISOR's agreement to accept any payments after they are due or a commitment by FRANCHISOR to extend credit to or otherwise finance Franchisee's operation of the Franchise Business. The payment of FRANCHISOR's expenses and/or the assessment of late charges or interest are not the sole remedies of FRANCHISOR in those circumstances and this Agreement may be subject to termination under Article 14.

### 4.15   Security Agreement; UCC-1 Filing; Letter of Credit

Franchisee agrees to execute the Security Agreement in the form of Appendix E granting FRANCHISOR or its affiliates a security interest in all unpaid products delivered to Franchisee, and that FRANCHISOR or its affiliates may file a UCC-1 Financing Statement with respect to any unpaid products delivered to Franchisee. Franchisee further agrees that at its discretion FRANCHISOR may require Franchisee to obtain a letter of credit from a financial institution or other qualified lender to secure the payment of inventory and products delivered to Franchisee.

**4.16   Product Delivery Fees.**

In the event Franchisee's Store is located within FRANCHISOR's or FRANCHISOR's Affiliate's distribution center delivery area. FRANCHISOR or its Affiliate may, but it is not obligated to, offer to Franchisee the option for FRANCHISOR, its Affiliate, or its representative to deliver Products to Franchisee's customers or Franchisee's Store.   If these services are requested, FRANCHSOR or its Affiliate will charge a delivery fee as provided in FRANCHISOR's Operations Manual.   Payment for delivery fees shall be due upon invoice. Delivery fees are subject to adjustment in the discretion of FRANCHISOR or its Affiliate and are dependent on the price of gasoline, labor and other operating expenses incurred in the delivery process.

**4.17   Warranty Administration Fees.**

If a customer chooses the "Fabric Protection Connection Warranty, Program," or other warranty program or plan, Franchisee agrees to pay a fee to handle calls, documentation, follow-up and other required administration by FRANCHISOR or its Affiliate to implement the warranty programs offered by third party vendors. A fee per warranty will be established by FRANCHISOR or it Affiliate as provided in FRANCHISOR's Operations Manual, and shall be due upon invoice. The parties acknowledge that this fee may increase over time during the term of this Agreement based on costs incurred by FRANCHISOR or its Affiliate to administer warranty programs for franchisees.

**4.18   Warehouse Landing Fees.**

Warehouse Handling fees will be charged to Franchisee when goods go through our Affiliate's warehouse, and Franchisee agrees to reimburse FRANCHISOR or its Affiliate for all variable warehouse landing fees incurred, including but not limited to, costs of receiving, stocking of inventory and all variable costs associated therewith and as determined by FRANCHISOR or its Affiliate. The warehouse landing fee shall be implemented through FRANCHISOR's Operations Manual and shall be due upon invoice.   The parties acknowledge that this fee may increase on an annual basis during the term of this Agreement based on costs incurred by FRANCHISOR or its Affiliate to warehouse and inventory products for franchisees. The parties acknowledge that FRANCHISOR reserves the right to retain for itself or its Affiliate, or its affiliates, all internet sales.

**4.19   Internet Sales Processing Fees**

If FRANCHISOR allocates an internet sale to Franchisee, Franchisee agrees to pay a fee of 2% to FRANCHISOR of such gross internet sale, in exchange for processing, or handling of merchandise with respect to internet sales, or sales generated through toll-free telephone numbers, catalogs, direct mail campaigns or other channels of distribution, that are referred or credited to Franchisee.  The fee shall be due upon invoice, and is in addition to all other fees assessed under this Agreement.  The parties acknowledge that this fee may increase over time during the term of this Agreement based on increased costs incurred by FRANCHISOR to provide these services to franchisees.  The parties acknowledge that FRANCHISOR reserves the right to retain for itself or its affiliate all internet sales.

# Article 5 - Services Provided to Franchisee

**5.1    Site Selection and Lease Negotiation.**

FRANCHISOR will provide Franchisee with site selection criteria for the location of the Franchise Business.  If requested, FRANCHISOR will review your proposed location.

**5.2    Construction and Improvements.**

FRANCHISOR will assist Franchisee in the process of construction or improvement of the Franchise Location by specifying the standard format for the construction or improvement of the Franchise Location.

**5.3    Equipment, Fixtures, Signs, Inventory and Suppliers.**

FRANCHISOR will specify and provide sources of supply for the equipment, fixtures, signs and AVF Product inventory necessary for Franchisee to develop and begin operation of the Franchise Business.

**5.4    Operations Manual; Update Specifications.**

FRANCHISOR will loan to Franchisee one copy of its Operations Manual for use in the operation of the Franchise Business.  FRANCHISOR will provide any updates to Franchisee of the Operations Manual and of FRANCHISOR's specifications for all aspects of the Franchise Business as they become available. The Manual may not be duplicated in any manner, and may be made available electronically.

**5.5    Training.**

FRANCHISOR will provide an initial program to train Franchisee to operate the Franchise Business, as well as ongoing training programs from time to time.  See Section 10.

**5.6    Computer Equipment and Software:**

Provide sources to Franchisee for lease or purchase computer equipment, software and backup support from third party vendors to generate customer invoices, accounts receivable reports and other management reports.

**5.7    Products and Services; Suppliers; Warranties.**

FRANCHISOR will designate the AVF Products and services to be offered by the Franchise Business and will provide Franchisee with any updates in FRANCHISOR's specifications for the products or services to be offered by the Franchise Business.  FRANCHISOR will provide sources of supply for all authorized products and services.  Any warranties with respect to any products sold by Franchisee, including AVF Products, will only be those provided by the manufacturer of such products

**5.8    Operational Assistance.**

A representative of FRANCHISOR will visit the Franchise Business after opening and will periodically visit the Franchise Business after that at such intervals deemed appropriate by FRANCHISOR throughout the remaining term of this Agreement.  Upon your request and depending upon availability of our staff, FRANCHISOR will provide a member of its staff to provide on-site advice and consultation in connection with the operation of the franchise. If FRANCHISOR is requested or required to make numerous visits to Franchisee in a 12

month period, Franchisee may be required to reimburse FRANCHISOR for the reasonable travel and lodging expenses it incurs. During these visits, the representative will evaluate Franchisee's operations and provide any operational advice and assistance deemed necessary by the representative. FRANCHISOR will also provide reasonable operational advice and assistance to Franchisee by telephone or email, including advice on specific services or products, if requested by Franchisee.

**5.9    Pricing.**

FRANCHISOR will provide guidance on the pricing of the products and services of the Franchise Business. Franchisee shall follow any pricing guidelines as specified by FRANCHISOR, subject to applicable law, including without limitation, minimum and maximum pricing.

**5.10   Advertising.**

FRANCHISOR will administer the Marketing Fund and review for approval, any local advertising proposed by Franchisee. See Article 9.

**5.11   FRANCHISOR's Services May be Provided by Independent Agents and Representatives.**

The services to be provided by FRANCHISOR under this Agreement may be provided by employees of FRANCHISOR or by independent representatives and agents engaged by FRANCHISOR.

**5.12   Consultation.**

Business consultation and advice, will generally be conducted by telephone support. Upon request and depending upon availability of AVF staff, AVF will provide a member of its staff to provide Franchisee on-site advice and consultation in connection with the operation of its AVF franchise. If Franchisee chooses this option, it will be required to reimburse AVF for the then-current per diem listed in the Operations Manual plus travel, meals and lodging expenses we incur.

**5.13   Reporting System.**

FRANCHISOR shall provide an approved Gross Sales reporting system, including one copy (in hard copy or electronic form) of certain materials and forms to be used in connection therewith (collectively, the "Reporting System").

**5.14   Bulletins.**

FRANCHISOR shall provide such bulletins, brochures and reports as may be published by FRANCHISOR regarding its plans, policies, research, developments and activities for the System.

**5.15   Internet Sale Referrals.**

All internet sales activities will be solely controlled, reserved and processed by FRANCHISOR or it affiliate, who shall solely determine the process, manner and method of delivering internet sales.

## Article 6 - Use and Protection of Franchise Marks

**6.1    Non-ownership of Franchise Marks.**

Nothing in this Agreement gives Franchisee any right, title or interest in or to any of the Franchise Marks or any goodwill in and to the Franchise Marks, except a mere privilege and license during the term of this Agreement, to display and use the Franchise Marks according to the terms and conditions of this Agreement.

**6.2    Use of Franchise Marks.**

Franchisee must use the Franchise Marks only in connection with the operation of the Franchise Business pursuant to the Franchise System and only in the manner specified in this Agreement, the Operations Manual or otherwise by FRANCHISOR. The Franchise Business must be operated under the Franchise Marks and under no other name or mark. Franchisee must not use the Franchise Marks in connection with any products or services not specifically authorized by FRANCHISOR in writing or in connection with any products or services that are not produced in accordance with the quality, uniformity and other standards established by FRANCHISOR in and through the Franchise System. FRANCHISOR will have the right at any time to examine the products and services offered by Franchisee, at the Franchise Location, to determine compliance with the applicable FRANCHISOR standards. If at any time FRANCHISOR becomes aware that the products or services provided by Franchisee fail to conform to those standards, FRANCHISOR will notify Franchisee. On such notification by FRANCHISOR, Franchisee must promptly cease to use the Franchise Marks on products that are non-conforming and must not sell any further non-conforming products or services until the standards are met to the satisfaction of FRANCHISOR.

Franchisee must not reproduce or cause to be reproduced any Franchise Marks in any manner, including reproduction on forms or invoices, in connection with advertising, marketing or promotion, or on the Internet or in an Internet domain name, without the prior written approval of FRANCHISOR. Franchisee must not use the Franchise Marks in its business, corporate, partnership or limited liability company name. Franchisee must register to do business under the assumed business name of "AVF <sup>TM</sup>" with an additional number or designation as determined by FRANCHISOR to distinguish the assumed name from other Stores (for example: "AVF of Troy").

On expiration or termination of this Agreement, FRANCHISOR may, if Franchisee does not do so, sign in Franchisee's name and on Franchisee's behalf, any documents necessary in FRANCHISOR's judgment to end and cause discontinuance of Franchisee's use of the Franchise Marks and FRANCHISOR is irrevocably appointed and designated as Franchisee's attorney-in-fact for that purpose.

Franchisee shall display in a conspicuous location at the Store, a notice to customers as to the identity of the Franchisee, identifying that Franchisee is an independently owned and operated business and "a Licensed Franchisee of AVF Franchising, LLC."

**6.3    Use of Other Trademarks.**

Franchisee must not display the trademark, service mark, trade name, insignia or logotype of any other person, firm or corporation in connection with the operation of the Franchise Business without the prior written consent of FRANCHISOR, which may be withheld in FRANCHISOR's sole subjective discretion.

K:\LEGAL\FRANCHISE (LEGAL)\AVF FRANCHISING LLC\IN\MCCORD\DRAFTS\FRANCHISE AGREEMENT.DOCX

13

### 6.4  Defense of Franchise Marks.

If Franchisee receives notice, or is informed, of any claim, suit or demand by a third party against Franchisee on account of any alleged infringement, unfair competition, or similar matter relating to Franchisee's use of the Franchise Marks, Franchisee must promptly notify FRANCHISOR of the claim, suit or demand. FRANCHISOR will then take such action as FRANCHISOR deems necessary and appropriate to protect and defend Franchisee against the claim, suit or demand. Franchisee must not settle or compromise any such claim by a third party without the prior written consent of FRANCHISOR. FRANCHISOR will have the sole right to defend, compromise or settle any such claim, in its discretion, using attorneys of its choosing, and Franchisee agrees to cooperate fully with FRANCHISOR in connection with the defense of any such claim. Franchisee may participate at its own expense in such defense or settlement, but FRANCHISOR's decisions with regard to the Franchise Marks will be final.

FRANCHISOR will indemnify Franchisee against liability to third parties resulting from claims by third parties that Franchisee's use of the Franchise Marks infringes trademark rights of the third party, but only if (a) Franchisee has used the Franchise Marks in accordance with the requirements of this Agreement, the Operations Manual and FRANCHISOR's specifications and (b) Franchisee has given written notice to FRANCHISOR of the claim within 10 days of receipt by Franchisee of the claim and Franchisee has tendered the defense of the claim to FRANCHISOR.

### 6.5  Prosecution of Infringers.

If Franchisee receives notice or is informed or learns that any third party, who Franchisee believes is unauthorized to use the Franchise Marks, is using the Franchise Marks or any name or mark confusingly similar to the Franchise Marks, Franchisee must promptly notify FRANCHISOR of the facts relating to such alleged infringing use. FRANCHISOR will then, in its sole discretion, determine whether or not it wishes to take any action against such third person on account of such alleged infringement of the Franchise Marks. Franchisee will have no right to make any demand against any such alleged infringer or to prosecute any claim of any kind or nature whatsoever against such alleged infringer for or on account of such infringement. If FRANCHISOR chooses to prosecute any violation of the Franchise Marks, Franchisee must sign all documents and do all acts necessary or incidental to that action as counsel for FRANCHISOR may reasonably request. Any damages awarded or recovered in any prosecution of an infringement claim related to the Franchise Marks will be the exclusive property of FRANCHISOR.

### 6.6  Modification or Substitution of Franchise Marks.

FRANCHISOR may change the authorization to use the Franchise Marks contained in this Agreement, including adding, discontinuing or modifying Franchise Marks, or substituting different Franchise Marks, by issuing, in the form of an Addendum, a description of the changes and the products or services to which they relate. Franchisee is required to use and abide by these changes or substitutions at its sole expense.

### 6.7  Validity and Ownership of Franchise Marks; Prohibition Against Disputing FRANCHISOR's Rights.

Franchisee acknowledges the validity of the Franchise Marks and that the Franchise Marks and any and all goodwill in and to the Franchise Marks are the exclusive property of FRANCHISOR or third parties who have licensed such Marks to FRANCHISOR. Franchisee also agrees that any further rights or goodwill that may develop in any of the Franchise Marks in the future will inure

solely to the benefit of FRANCHISOR, including, without limitation, any goodwill caused by or attributable to Franchisee's use of the Franchise Marks. Franchisee now asserts no claim and will in the future assert no claim to any goodwill, reputation or ownership of the Franchise Marks by virtue of Franchisee's licensed use of the Franchise Marks or for any other reason. Franchisee must not, during or after the term of this Agreement, in any way dispute or impugn the validity of the Franchise Marks, or the rights of FRANCHISOR in the Franchise Marks, or the rights of FRANCHISOR or other Franchisees of FRANCHISOR to use the Franchise Marks.

## Article 7 - Franchise Location, Lease and other Pre-Opening Obligations

### 7.1 Location Selection and Approval.

The location for the Franchise Business must be approved in advance in writing by FRANCHISOR and Franchisee must always operate its Franchise Business only at a location approved in writing by FRANCHISOR (the location approved in writing by FRANCHISOR will be referred to in this Agreement as the "Franchise Location"). If a location for the Franchise Business has been determined and approved before the signing of this Agreement, that location will be designated in Item 1 of Appendix A. If the exact location of the Franchise Business has not been determined before signing of this Agreement, Franchisee must use its best efforts to find a suitable location for the Franchise Business within the area designated in Item 1 of Appendix A, but must obtain a lease for a site within **180** days from signing of this Agreement. Franchisee must submit to FRANCHISOR, in a form acceptable to FRANCHISOR, a description of the proposed site, evidence confirming the Franchisee's prospects for obtaining the site, demographic information, economic terms, use clause and any other materials FRANCHISOR specifies before FRANCHISOR will consider approving the location. Although FRANCHISOR may provide its assistance in obtaining a Franchise Location, it is Franchisee's responsibility to obtain and evaluate its commercial value for operation of the Franchise Business. FRANCHISOR's location recommendations and its approval of the Franchise Location do not constitute a representation or guaranty of the commercial value or success of the Franchise Location.

If the Franchise Location initially approved by FRANCHISOR becomes unusable for the Franchise Business, Franchisee must obtain written approval of a new site. If the initial Franchise Location became unusable through no fault of Franchisee and a substitute location is not available, this Agreement will terminate on conclusion of operation of the Franchise Business at the initial Franchise Location.

### 7.2 Lease Requirements.

If Franchisee leases the Franchise Location from a third party, the terms and form of Franchisee's lease must be approved in writing by FRANCHISOR and the lease must not be terminated, or in any way altered or amended by Franchisee without the prior written consent of FRANCHISOR.

Franchisee's lease with a third party must contain the provisions specified by FRANCHISOR, including provisions: (a) prohibiting the Franchise Location from being used for any purpose other than a Store; (b) recognizing and allowing FRANCHISOR rights to assignment of the lease upon default by Franchisee of this Agreement or its lease with the Landlord; (c) after FRANCHISOR's acceptance of assignment of the Lease, recognizing FRANCHISOR's right to assign its rights in the Lease to another Franchisee; (d) recognizing and allowing FRANCHISOR's

right to enter the Franchise Location to inspect and audit the Franchise Business or to make any modifications necessary to protect the Franchise Marks; (e) if the Franchise Location is located in a strip mall, enclosed mall, shopping center or similar location, prohibiting the landlord from leasing any other space in the mall or center to another business that sells the same products as a Store; (f) requiring the landlord to give written notice and an opportunity for FRANCHISOR or a person specified by FRANCHISOR, to cure any default of Franchisee under the lease before landlord exercises any remedy under the lease; (g) providing FRANCHISOR with a cure period of no less than 30 days after any cure period of Franchisee under the lease. (h) requiring landlord and Franchisee to give FRANCHISOR 30 days prior written notice of: (i) the cancellation or termination of the lease prior to the expiration date of the lease; (ii) an assignment or attempted assignment of the lease by the landlord or Franchisee; (iii) the sublease or attempted sublease by Franchisee; and (iv) any modification of the lease; and (g) requiring landlord and Franchisee to provide written notice to FRANCHISOR within 15 days after: (i) Franchisee exercises any option to extend the lease; (ii) landlord and Franchisee renew the lease; and (iii) the landlord institutes any action against Franchisee, including an eviction action. Except in accordance with this Agreement, Franchisee must not assign its lease or let or sublet the Franchise Location or any portion of the Franchise Location without the prior written consent of FRANCHISOR.

**7.3    Licenses and Permits.**

Franchisee must obtain all zoning and other approvals and all permits or licenses required by federal, state or local law for construction and operation of the Franchise Business, including certificates of occupancy.

**7.4    Completion of Training.**

Franchisee must complete the training program specified by FRANCHISOR, to the satisfaction of FRANCHISOR, before beginning operation of the Franchise Business.

**7.5    Development of Franchise Business and Franchise Location.**

Franchisee must fully develop the Franchise Business in accordance with FRANCHISOR's specifications. Franchisee must construct and/or improve the Franchise Location in compliance with FRANCHISOR's specifications, including but not limited to specifications for build-out, decor, signage, equipment, space, etc. This includes the following responsibilities, which must be diligently performed by the Franchisee:

(a)    Hire an interior designer approved by FRANCHISOR to undertake and provide build-out specifications.

(b)    Employ a licensed architect and/or engineer, as required by state and local codes, approved by FRANCHISOR, to prepare sealed construction documents to submit for building permits and a final set of construction documents using FRANCHISOR's plans and specifications.

(c)    Furnish FRANCHISOR with the final set of construction documents, including signage, and a summary of build out expenses on a form specified by FRANCHISOR.

(d)     Obtain approval of the plans and specifications from the landlord and local authorities and FRANCHISOR before beginning construction.

(e)     Obtain or require the contractor to obtain payment and performance bonds.

(f)     Obtain all zoning changes, sign permits and any other required permits and approvals.

(g)     Purchase or lease and install equipment, fixtures, furniture, inventory, accessories, supplies and signs needed for the opening of the Franchise Business in accordance with FRANCHISOR's specifications.

(h)     Complete the construction or remodeling of the Franchise Location in full and strict compliance with the plans and specifications approved by FRANCHISOR and the landlord and with all applicable ordinances, building codes and permits requirements.

(i)     Complete development of and have the Franchise Business ready to open and commence the conduct of its business by the date described in Section 8.1 of this Agreement.

Franchisee must diligently perform the responsibilities listed above at times reasonably required by FRANCHISOR in order to complete the development of the Franchise Business in a proper and timely manner. Franchisee must report to FRANCHISOR as to the progress of the development of the Franchise Business. FRANCHISOR may, but is not required to, assist the Franchisee in completing the above listed responsibilities. Where FRANCHISOR's action and response is required with respect to any of the Franchisee's obligations listed above, FRANCHISOR will act or respond in a reasonable and timely manner.

**7.6     Telephone Numbers; Internet Access; E-mail Addresses.**
Franchisee must acquire and maintain a minimum of two telephone lines dedicated solely to the Franchise Business. FRANCHISOR may, at its option, obtain and register in its name, the telephone lines and numbers to be used at the Franchise Business. Franchisee must pay all costs and charges for the installation, maintenance and use of the telephone lines and numbers, even if those lines and numbers are obtained and registered in the name of FRANCHISOR. Franchisee must acquire and maintain at all times a static IP address and a high speed (T-1, Cable, DSL, Satellite or other high-speed access) Internet access for communication with customers and FRANCHISOR by email and other electronic means, connection to FRANCHISOR's intranet systems (if any) and to allow FRANCHISOR to access Franchisee's POS computer system remotely 24 hours a day and seven days a week. Franchisee must also acquire and maintain an e-mail address so that FRANCHISOR and Franchisee may communicate by e-mail. If specified by FRANCHISOR, Franchisee must participate in the centralized email system maintained by FRANCHISOR. In that case, Franchisee must pay FRANCHISOR a reasonable annual fee to cover FRANCHISOR's time and expenses involved in maintaining and servicing the centralized email system. The annual fee will be payable in advance on January 20th of each year.

# Article 8 - Operations

**8.1   Opening Date; Continuing Operations and Best Efforts.**

Franchisee must begin operation of the Franchise Business by the date specified in Item 3 of Appendix A, including conversion to the AVF System if Franchisee is a Conversion Store Franchisee, but no later than **270** days from execution of this Agreement. If operations do not begin by the specified date, FRANCHISOR may terminate this Agreement and retain all fees paid. Franchisee must continually operate the Franchise Business after opening in accordance with the provisions of this Agreement throughout the term of this Agreement. Franchisee must use its best efforts to promote and maximize the sales of the Franchise Business throughout the term of this Agreement. Franchisee must maintain at all times, sufficient equipment, supplies and personnel to operate the Franchise Business at optimal capacity and efficiency as specified by FRANCHISOR.

**8.2   Standards of Operation; Operations Manual.**

Franchisee acknowledges that every component of the Franchise System is important to FRANCHISOR and to the operation of the Franchise Business. Franchisee must, at all times, operate and maintain the Franchise Business in a competent manner and in full compliance with all aspects of the Franchise System specified by FRANCHISOR. In all business dealings with the public, Franchisee must be governed by the highest standards of honesty, integrity, fair dealing and ethical conduct.

Franchisee must comply with all policies and procedures specified by FRANCHISOR in connection with the operation of the Franchise Business. These specifications may include standards, techniques and procedures for: (a) the safety, maintenance, cleanliness, sanitation, function, hours of operation and appearance of the Franchise Business and its equipment, fixtures, inventory, decor and signs; (b) qualifications, dress, uniforms, grooming, general appearance, demeanor and training of employees; (c) the products and services required or authorized to be offered and sold by the Franchise Business; (d) type, quality, and uniformity and manner of sale of all of the products sold by the Franchise Business; (e) methods and procedures relating to receiving, preparing and delivering customer orders; (f) sales, advertising and promotional techniques and programs; (g) construction, maintenance and appearance of the Franchise Business and the Franchise Location; (h) payment, credit, accounting and financial reporting policies and procedures; (i) use of FRANCHISOR's intranet (if established) for entering sales and other information, making schedules, projecting sales, ordering supplies, entering labor and other expenses, receiving reports and other operational requirements as specified by FRANCHISOR; (j) purchase and maintenance of equipment, fixtures and inventory; (k) insurance coverage; (l) use of standard forms; (m) use and protection of the Franchise Marks and other proprietary rights of FRANCHISOR in accordance with Franchise Mark Usage Guidelines, and any trade secret or information protection programs or other intellectual property policies established from time to time by FRANCHISOR; (n) use and illumination of exterior and interior signs, displays and similar items; (o) atmosphere of the Franchise Location, including, without limitation, such things as music and lighting; (p) warranties to customers and the handling of customer complaints and customer communications; (q) identification of the Franchise Business as an independently owned and operated business; (r) attendance by Franchisee and managers at required training programs and meetings; (s) using and honoring gift certificates, coupons and other such local and national promotional programs authorized or specified by FRANCHISOR; and (t) other details of the operation of the Franchise Business and the relationship between AVF and Franchisee as exists now or developed in the future by FRANCHISOR.

The policies and procedures specified by FRANCHISOR may be contained in training, operating and marketing manuals of FRANCHISOR or in memos, bulletins, newsletters, emails, or other written or electronic materials prepared by FRANCHISOR (for the purposes of this Agreement, "Operations Manual" will mean all manuals or other written materials relating to the Franchise System or containing FRANCHISOR's specifications that are provided to Franchisee). Franchisee will be issued a copy of any currently existing Operations Manual after the signing of this Agreement or when and if prepared by FRANCHISOR and made available to franchisees. Franchisee will be issued any applicable modifications or additions to the Operations Manual as they become available. The Operations Manual remains the property of FRANCHISOR, must not be duplicated, must never be disclosed to any person or entity and must be returned to FRANCHISOR immediately on request or on expiration or termination of this Agreement.

Franchisee must at all times ensure that its copy of the Operations Manual is kept current and up to date. If there is a dispute as to the contents of the Operations Manual, the terms and dates of the master copy of the Operations Manual maintained by FRANCHISOR at its place of business will be controlling.

Due to the nature of operation of the Franchise Business and the fact that the specifications for the Franchise Business must and do change, FRANCHISOR reserves the right to change the Franchise System after the signing of this Agreement and to change the terms of the Operations Manual after the signing of this Agreement to reflect those changes. Franchisee must comply with all such changes immediately on written notice from FRANCHISOR of the change at Franchisee's sole cost and expense.

**8.3    Acquisition of Products and Services.**
Franchisee must obtain all equipment, fixtures, signs, inventory, and all other products and services from sources specified by FRANCHISOR for development and operation of the Franchise Business.

**8.4    Specifications and Approved Suppliers for Products and Services.**
In order to maintain uniqueness, consistency, uniformity, quality and identity of the products and services offered and sold by Stores and the group purchasing power of FRANCHISOR, Franchisee must comply with the product and supply requirements set forth in this Section.

Franchisee must offer for sale only those products and services approved in advance in writing by FRANCHISOR. Franchisee must purchase all products (including AVF Products) supplies and equipment used in the development and operation of the Franchise Business in accordance with FRANCHISOR's specifications and only from FRANCHISOR or a manufacturer, supplier or distributor designated by FRANCHISOR (which may be an affiliate of FRANCHISOR) (an "Approved Supplier"). FRANCHISOR may add or delete Approved Suppliers from time to time and Franchisee must comply with those changes immediately on written notice from FRANCHISOR. If FRANCHISOR adds an Approved Supplier, Franchisee must immediately, on written notice from FRANCHISOR, take the steps necessary to comply with the purchase and other policies of the Approved Supplier. If the Company deletes an Approved Supplier, Franchisee must cease purchasing products and services from that supplier immediately on written notice from FRANCHISOR.

Upon submission to FRANCHISOR of an alternative supplier, FRANCHISOR will review and evaluate such supplier to determine its ability to meet its standards and specifications, who possess adequate quality controls, and who have the capacity to supply the needs of Stores promptly and reliably. Such review will typically be completed within 60 days. FRANCHISOR reserves the right to limit the number of approved suppliers for purposes of efficiency and effective buying power.

FRANCHISOR may designated specified architectural and/or contractors to undertake construction, design and architectural work at the Franchise Location.

FRANCHISOR may, from time to time, enter into agreements with Approved Suppliers for and on behalf of all Stores in a particular region.

The designation by FRANCHISOR of an Approved Supplier does not create any express or implied promise, guaranty or warranty by FRANCHISOR as to the products or services of the Approved Supplier and FRANCHISOR will not have any liability to Franchisee for any claims, damages or losses suffered by Franchisee as a result of or arising from the products or services provided by the Approved Supplier or its acts or omissions.

FRANCHISOR has the right to receive rebates or other fees from Approved Suppliers based on sales of products or services to any franchisee or Store(s). FRANCHISOR may use those rebates and fees for any purpose in FRANCHISOR's discretion, including FRANCHISOR retaining all of the rebates. Franchisee must cooperate with FRANCHISOR and its affiliates in the collection of those rebates and fees. Franchisee acknowledges that FRANCHISOR's affiliate currently receives rebates from manufacturers based upon Franchisee's purchase of inventory from FRANCHISOR's affiliate and FRANCHISOR's affiliate retains all such rebates. Franchisee acknowledges that it has no claim to such rebates.

Any products or services sold by or through FRANCHISOR or its affiliates will be sold in accordance with the terms set forth in memos, bulletins, emails, franchisee meetings or otherwise in writing by FRANCHISOR, its affiliate or by the manufacturer of the products. These terms may be modified on written notice from FRANCHISOR, its affiliate or the manufacturer of the products.

**8.5    Products and Services Offered by the Franchise Business; Pricing; Promotional Programs.**

Franchisee must sell all products and provide all services that FRANCHISOR specifies for sale for the Franchise Business. In conducting its Franchise Business, Franchisee must not sell any products (including AVF Products), provide any services or engage in any business at the Franchise Business or Franchise Location other than those specified by FRANCHISOR without written authorization from FRANCHISOR. FRANCHISOR may add or delete required or authorized products or services to be provided by the Franchise Business. If any products or services are added, Franchisee must be qualified to provide the products and services before FRANCHISOR will authorize Franchisee to offer those products and services. If a product or service is deleted, Franchisee must cease offering that product or service immediately on written notice from FRANCHISOR. FRANCHISOR will make all changes in the required products and services for good faith marketing reasons and on a uniform basis for all similarly situated franchisees in a particular market, except when test marketing products or services.

FRANCHISOR will provide guidance on the pricing of the products and services sold by Franchisee. Franchisee must follow any pricing guidelines specified by FRANCHISOR, subject to applicable law.

Franchisee agrees to participate in any gifts cards, electronic gift or money cards (E-cards), electronic currency, frequency cards or other programs specified by FRANCHISOR and to honor all such cards issued by FRANCHISOR or by other franchisees in accordance with FRANCHISOR's policies. Franchisee acknowledges and agrees that Franchisee's participation in those programs is integral to the Franchise System and to the success of those programs. FRANCHISOR or a person designated by FRANCHISOR will administer any gift and E-card or other such programs specified by FRANCHISOR. Franchisee agrees that FRANCHISOR may charge an administrative fee for administrating those programs. Franchisee also agrees to honor and/or participate in discount coupons or similar promotional materials, drives, prizes, giveaways, contests and other programs, local, regional or national, related to sales promotions, specified by FRANCHISOR to the extent that participation does not violate federal or state law.

**8.6    Maintenance; Refurbishing; Alterations.**
Franchisee must maintain the Franchise Location, its equipment, fixtures, decor and signs for the Franchise Business in a clean, attractive and safe condition and in good maintenance and repair and in compliance with the standards specified by FRANCHISOR. If at any time, in FRANCHISOR's reasonable judgment, the general state of repair, appearance or cleanliness of the Franchise Location or its equipment, décor, fixtures or signs do not meet FRANCHISOR's standards, FRANCHISOR may notify Franchisee in writing, specifying the action to be taken by Franchisee to correct the deficiency. Franchisee must initiate the specified action within 30 days after receipt of the notice and diligently proceed to complete the specified action. If Franchisee fails to do so, then Franchisee will be deemed to be in breach of this Agreement, and, FRANCHISOR will have the right, in addition to its other rights under this Agreement, but will not be obligated to, enter the Franchise Location and cause the specified action to be taken on behalf of Franchisee and Franchisee must pay the entire cost to FRANCHISOR on demand.

In addition to regular maintenance obligations, after written notice from FRANCHISOR, not more than once during the franchise term, and upon renewal, Franchisee must rehabilitate, modernize, upgrade and replace fixtures, furniture, furnishings, signs and equipment and also to make changes in design, decoration and renovation adopted by Franchisor to maintain or improve the appearance and efficient operation of the Franchise Business. The requirement to refurbish the Franchise Location will be imposed uniformly on all Franchisees presently acquiring a franchise, but the expenses incurred in fulfilling the requirement will vary depending on such factors as the condition of the Franchise Location and local costs of construction. If the refurbishing requires spending less than $20,000, Franchisee will have 30 days to complete the refurbishing. If the refurbishing requires spending $20,000 or more, Franchisee will have 60 days to complete the refurbishing.

Upon renewal of the Franchise Agreement or permitted assignment of Franchise rights, the Franchisee or assignee as the case may be, must complete specified refurbishing of the Franchise Location within ninety (90) days after the date of renewal, or the closing of escrow upon assignment. If such refurbishing is not completed within such time, FRANCHISOR may terminate

the renewal agreement or the Franchise Agreement and all rights of the Franchisee or assignee. FRANCHISOR shall notify Franchisee prior to renewal, or assignee and Franchisee prior to closing of escrow, of any refurbishing which it requires. Such refurbishing shall be performed pursuant to Franchisee's standards and criteria within the time period set forth herein as a condition to final approval as an authorized Franchisee and/or permitted assignee of Franchisee

Franchisee must make no material alterations to the leasehold improvements or appearance of the Franchise Location and must not make any material alterations to the equipment, fixtures or signs of the Franchise Business without prior written approval of FRANCHISOR.

## 8.7    Designated Owners; Managers.
The individual or at least one of the individuals designated in Item 4 on Appendix A (a "Designated Owner"), must: (a) devote his or her full time and effort to the day-to-day active management and operation of the Franchise Business; (b) personally exercise his or her best efforts to market the Franchise Business and maximize customer satisfaction; (c) preserve and exercise ultimate authority and responsibility with respect to the management and operation of the Franchise Business; and (d) represent and act on behalf of Franchisee in all dealings with FRANCHISOR. Each Designated Owner must have an ownership interest in Franchisee. If all of the Designated Owners resign, die or become incapacitated, it will be considered a transfer under the provisions of Article 13 of this Agreement. If Franchisee desires to have a manager, other than a Designated Owner, devote full time and effort to the day-to-day active management and operation of the Franchise Business in place of a Designated Owner, the manager must successfully complete the training program designated by FRANCHISOR and must be approved, in writing, by FRANCHISOR. FRANCHISOR must also approve, in writing, any change in such management personnel. Franchisee must require all of its managers to sign an agreement relating to confidentiality in the form specified by FRANCHISOR as a condition of employment of the manager.

## 8.8    Employees.
Franchisee must implement a training program for employees in compliance with FRANCHISOR's standards. Franchisee must maintain at all times a staff of trained employees sufficient to operate the Franchise Business in compliance with FRANCHISOR's standards. Franchisee must require its employees and agents to sign an agreement relating to confidentiality in the form specified by FRANCHISOR as a condition of employment of the employee.

FRANCHISOR may impose a reasonable per diem charge for any training provided to Franchisee, its managers or employees, beyond the initial training program described in Section 10.1. Any such fees will be uniform as to all persons attending training at that time and will be based on FRANCHISOR's out-of-pocket expenses plus the per diem rate of the training personnel involved. These fees are not refundable.

## 8.9    Insurance.
Franchisee must obtain and provide FRANCHISOR with evidence of insurance in the minimum amounts and coverage's as follows:

| Type of Coverage | Limits/Specifications |
|---|---|
| Premises Liability | $2,000,000.00 |
| | |

| Type of Coverage | Limits/Specifications |
|---|---|
| Commercial Liability | $2,000,000.00 |
| | |
| Business Property | $500,000.00 |
| | |
| Workers' Compensation | Statutory Requirements |
| | |
| Hired and Non-Owned Automobile Liability | $1,000,000 Combined Single Limit |
| | |
| Cyber Liability Insurance | $1,000,000.00 |
| | |
| Umbrella | $2,000,000.00 |

Evidence of this insurance must be initially provided at least fourteen days before beginning operation of the Franchise Business. Certificates of renewal must be provided no later than fourteen days before the expiration date of each policy. If Franchisee does not provide FRANCHISOR with evidence of any required insurance policies at any due date, FRANCHISOR may (but is not obligated to) purchase that insurance at Franchisee's expense. Franchisee must immediately pay for any insurance obtained by FRANCHISOR.

Each required insurance policy must meet the following requirements: (a) the policy must name FRANCHISOR (and any affiliates of FRANCHISOR that FRANCHISOR may reasonably specify) as an additional insured; (b) the policy must not be subject to cancellation, modification or amendment except after 30 days written notice to FRANCHISOR; (c) the insurance must be placed with an approved vendor and an insurance carrier with an AM Best's Rating of not less than A; (d) the policy must provide that failure by Franchisee to comply with any term, condition or provision of the insurance contract, or other conduct by Franchisee, will not void or otherwise affect the coverage afforded FRANCHISOR or its affiliates (e.g. FRANCHISOR, although named as an insured, will nevertheless be entitled to recover under such policies on any loss occasioned to FRANCHISOR or its agents or employees by reason of the negligence of Franchisee or Franchisee's agents or employees); (e) the policy must contain a waiver of subrogation in favor of FRANCHISOR for casualty losses.

## 8.10   Compliance with Laws and Other Obligations.

Franchisee must obtain and keep in force every registration, charter, license or permit required for the Franchise Business. Franchisee must comply with all federal, state, county, municipal or other statutes, laws, ordinances, regulations, rules or orders applicable to the Franchise Business. Franchisee must pay, when due, all taxes of every kind applicable to the Franchise Business or the income of the Franchise Business, including all local, state or federal taxes. Franchisee must immediately notify FRANCHISOR if any governmental department or agency begins an investigation of the Franchise Business, schedules a review, inspection or audit of the Franchise Business or takes any action against the Franchise Business.

**8.11  Separate Identification of Franchise Business.**

Franchisee must identify the Franchise Business as a separate business by filing an assumed name certificate as appropriate in the state and/or county of location of the Franchise Business. Also, Franchisee must display signs, notices or plaques specified by FRANCHISOR to identify the separate ownership of the Franchise Business.

**8.12  Indemnification.**

Franchisee is responsible for all losses or damages from contractual liabilities to third persons from the possession, ownership and operation of the Franchise Business and all claims or demands for damages to property or for injury, illness or death of persons, directly or indirectly, arising out of, or in connection with, possession, ownership or operation of the Franchise Business or the actions or omissions of Franchisee. Franchisee must defend, indemnify and hold harmless FRANCHISOR and its affiliates, subsidiaries and parent companies and their agents, employees, attorneys and other franchisees, their agents, employees and attorneys, against any and all claims, suits, demands, losses, damages or liabilities and all related expenses, including reasonable attorney's fees and court costs, which arise out of, in connection with, or as a result of possession, ownership or operation of the Franchise Business or the acts or omissions of Franchisee. This indemnity obligation will continue in full effect even after the expiration, transfer or termination of this Agreement. FRANCHISOR will notify Franchisee of any claims against FRANCHISOR subject to this Section. FRANCHISOR may defend the action in the manner it deems appropriate and Franchisee must pay FRANCHISOR for all costs, including reasonable attorneys' fees, incurred by FRANCHISOR in defending the action, in addition to any sum which FRANCHISOR may pay by reason of any settlement or judgment against FRANCHISOR in the action. FRANCHISOR's right to indemnity under this Agreement will arise and be valid notwithstanding that joint or concurrent liability may be imposed on FRANCHISOR by statute, ordinance, regulation or other law.

**8.13  Participation in Franchisee Advisory and other Committees.**

FRANCHISOR may establish committees of franchisees to advise FRANCHISOR on various matters involving the Franchise System. Franchisee will be eligible to participate on such committees, in accordance with the rules established by FRANCHISOR and each committee, but only if Franchisee is a Franchisee in good standing. In order to be a Franchisee in good standing, Franchisee must be: (a) current in all obligations to FRANCHISOR and (b) operating in accordance with the all requirements of the Franchise System, including requirements relating to quality, cleanliness and service.

**8.14  Notices to FRANCHISOR.**

Franchisee must notify FRANCHISOR in writing of the details of any of the following events, within one business day of the occurrence of the event:

(a)  The start of any civil or criminal action, suit, countersuit or other proceeding against Franchisee or any Designated Owner.

(b)  Franchisee, or any Designated Owner, receives a notice of noncompliance with any law, rule or regulation.

(c)  The issuance of any order, writ, injunction, award or decree of any court, any agency or other governmental organization against Franchisee or any Designated Owner.

(d)     Any complaints, inspections, reports, warnings, certificates or ratings of Franchisee or the Franchise Business, communicated, issued, performed, or scheduled by any governmental agency.

Franchisee must provide FRANCHISOR with any additional information FRANCHISOR requests, within five days of request, about the status, progress or outcome of any of the events listed in this Section.

**8.15   Minimum Annual Sales Volume and Net Operating Income.**
Franchisee agrees that it shall maintain an annual minimum fiscal year based sales volume that shall be the greater of (i) $3,000,000, or (ii) 50% of the sales volume achieved by Franchisee during its prior fiscal year.  In addition, net operating income before taxes for each fiscal year (as defined by generally accepted accounting principles– "GAAP") must be at least $1.00. In the event Franchisee fails to meet these criteria, Franchisee shall be in default and shall have 6 months from the date of written notice to cure a sales deficiency by achieving the greater of 50% of the figure designated in 8.15(i) above, or 25% of the annual sales volume the Franchisee achieved in the prior fiscal year.  In the event of an income deficiency, Franchisee shall have a period of 12 months from the date of written notice to cure such deficiency, by achieving net operating income before taxes of at least $1.00 during such period.

## Article 9 – Advertising

**9.1     Grand Opening Advertising.**
Franchisee must spend, as required in Section 4.3, an amount to be used for grand opening advertising for the Franchise Business ("Franchisee's Grand Opening Advertising Payment"). This amount will be used for advertising for the Franchise Business within the period beginning seven (7) days before the opening of the Franchise Business and ending seven (7) days after the opening of the Franchise Business or as otherwise agreed by FRANCHISOR and Franchisee. FRANCHISOR and Franchisee will work together to develop a grand opening advertising plan, which must be approved by FRANCHISOR.  Franchisee will be responsible for implementing the plan.

**9.2     Marketing Fund.**
Franchisee must make weekly contributions, as required under Section 4.3, to a Marketing Fund (the "Marketing Fund" or "Fund") that will be administered by FRANCHISOR, Art Van Furniture, LLC, or an agency designated by FRANCHISOR.  The Fund will be used to maximize general public recognition and patronage of the Franchise Marks and Franchise System.  Franchisor will use the Fund to formulate, develop, and produce marketing and promotional programs and to conduct marketing and promotional programs on a national, regional or local level as FRANCHISOR determines, in its discretion, to be most effective in marketing its goals.  This includes but is not limited to producing marketing and promotional materials for use by all AVF franchisees; pay outside consultants; fund media placement of marketing, and promotion materials, direct mail, AVF website, Internet and other programs, public relations programs and payments to national trade associations; and reimbursement of FRANCHISOR for costs in administering the marketing program. FRANCHISOR is not required to spend any designated amount to place

advertising in Franchisee's local area or in any specific media or other Marketing Fund expenditures in your Protected Territory.

As described below, any advertising placed by Franchisee must be approved in advance by FRANCHISOR. FRANCHISOR may engage the services of an advertising agency or sources to formulate, develop, produce and conduct advertising and these costs will be paid by the Fund. FRANCHISOR will not use the Fund for advertising that is primarily for the solicitation for the sale of franchises.

If Franchisor does not use Fund contributions during the fiscal year in which they accrue, Franchisor will hold those funds for use in the following year.

FRANCHISOR will submit to Franchisee, on request, an annual report of the receipts and disbursements of the advertising fund, which may be unaudited and prepared by management of FRANCHISOR, or Art Van Furniture, LLC.

In no event will FRANCHISOR or any agency engaged by FRANCHISOR be liable for consequential or incidental damages resulting from administration of the Marketing Fund or resulting from any advertising produced or placed by or on behalf of FRANCHISOR or Franchisee or the failure to produce or place such advertising, including any claims for loss of business, and Franchisee waives any such claims.

**9.3    Local Advertising.**
Franchisee is required to spend each month on local advertising an amount that is not less than 3% of Gross Sales. Copies of monthly advertising expenditures shall be submitted to FRANCHISOR at the time of monthly Marketing Fund payments. In the event such local advertising requirement is not met by Franchisee, FRANCHISOR shall have the option to electronically debit from Franchisee's bank account an amount equal to 3% of Gross Sales last reported by Franchisee, which amount shall be spent by FRANCHISOR for expenses related to creation of advertising and placement of same in Franchisee's local market area.

**9.4    Additional Advertising; Approval of Advertising Materials.**
All advertising by Franchisee in any medium, including signage, must be factual and dignified, must conform to the standards and specifications of FRANCHISOR, and to the highest standards of ethical advertising practice, and must be approved by FRANCHISOR in writing before it is used. No handwritten signs or otherwise non-conforming sign designs are allowed. No computer generated signs are allowed unless they have been provided by FRANCHISOR or approved in writing by FRANCHISOR. Franchisee must submit to FRANCHISOR for approval all marketing and promotion materials, including signage, prepared by Franchisee for the Franchise Business and not prepared by or previously approved by FRANCHISOR. These materials must be submitted to FRANCHISOR at least 14 days before use. Franchisee agrees to refrain from any business or advertising that may be injurious to the business of FRANCHISOR and the goodwill associated with the Franchise Marks and Franchise System and other Stores.

All local advertising, promotion and marketing or similar materials shall be submitted to FRANCHISOR for approval and shall be approved in writing prior to its placement by Franchisee. In the event FRANCHISOR fails to respond within fifteen (15) days from Franchisor's receipt of

proposed advertising from Franchisee, the request shall be deemed to be denied. Franchisee shall not advertise any products or services for the Franchise Location, other than those Products or Services licensed by this Agreement or otherwise approved in writing by Franchisor.

Franchisee must advertise generally in accordance with the announced recommendations of Franchisor and shall change or discontinue any advertising if requested to do so by FRANCHISOR for reasonable cause. Reasonable cause shall include, but not be limited to, advertising which violates any provision of this Agreement; is unduly offensive; materially out of character with FRANCHISOR's quality image; or will harm or undermine FRANCHISOR, other Franchisees or the Franchise System.

FRANCHISOR may develop from time to time, various advertising aids, program, folders, media and other materials for the use and benefit of all Franchisees and promotion of the Franchise System. Franchisee must avail itself of such materials to the extent feasible and practical for its Franchise Location and local market.

In the event that Franchisee places any advertisement or similar notice seeking a buyer for the Franchise or seeking a loan or an investor, Franchisee shall not include nor allow the words "AVF" or "Art Van" to appear to be a part of any such advertisement or notice. Franchisee may, however, describe the business in general generic terms. Franchisee agrees to enforce this restriction on the activities of its sales agents, brokers and representatives.

Franchisee agrees to use in the operation of its business only such stationery, business cards and printed materials uniformly used by all Franchisees or otherwise approved by FRANCHISOR in writing. FRANCHISOR agrees to approve any reputable local company that is convenient to Franchisee as a source of printed materials if so requested by Franchisee, provided that such company is capable of reproducing the materials.

In the event Franchisee determines to offer special discounts or coupons to induce customers to patronize its Franchise Business, such discounts or coupons must state the following legend: "THIS COUPON IS VALID ONLY AT (YOUR ADDRESS). OTHER AVF LOCATIONS MAY BE INDEPENDENTLY OWNED AND OPERATED AND ARE UNDER NO OBLIGATION TO ACCEPT THIS COUPON." If Franchisee's coupons are accepted by other franchisees or Company owned locations, upon Franchisor's request, Franchisee must reimburse the coupon-accepting location the difference between its regular price and the price obtained pursuant to the coupon(s) it accepted.

## 9.5    Use of Internet, Websites, Catalogues or Toll-Free Telephone Numbers.

FRANCHISOR retains the sole right to solicit or accept orders directly or through other channels of distribution, such as the Internet, websites, catalog sales, telemarketing, or other direct marketing under the AVF System. Franchisee may not offer AVF Products or services directly or through other channels of distribution, such as the Internet, websites, catalog sales, telemarketing, or other direct marketing outside of your Protected Territory, except as set forth below. Franchisee may not offer or market AVF Products through any of the methods set forth in this Section 9.5 without the prior written approval of FRANCHISOR. Franchisee may not establish a presence on, or market using, the Internet or any social media, such as, without limitation, Facebook, Twitter,

Four Square, Snapchat, Instagram, etc., in connection with the Franchise Furniture Store without Franchisor's prior written consent. Franchisor has established and maintains an Internet website at the uniform resource locator www.artvan.com that provides information about the System and the products and services that Franchisor and its franchisees provide. Franchisor will include at the www.artvan.com website an interior page containing information about the Franchise Furniture Store. If Franchisor includes such information on the Art Van website, Franchisor has the right to require Franchisee to prepare all or a portion of the page, at Franchisee's expense, using a template that Franchisor provides. All such information shall be subject to Franchisor's approval prior to posting. Any websites or other modes of electronic commerce that we establish or maintain may – in addition to advertising and promoting products or services available at the franchised Furniture Stores – also be devoted in part to offering franchises for sale and be utilized by Franchisor to exploit the electronic commerce rights we alone reserve in this Agreement. Franchisor retains the sole right to advertise or use the Marks on the Internet, including the use of websites, domain names, uniform resource locators, keywords, linking, search engines (and search engine optimization techniques), banner ads, meta-tags, marketing, auction sites, e-commerce and co-branding arrangements. Franchisee may be requested to provide content for Franchisor's Internet marketing and shall be required to follow Franchisor's intranet and Internet usage rules, policies and requirements. Franchisor alone will be, and at all times will remain, the sole owner of the copyrights to all material which appears on any website we establish and maintain, including any and all material you may furnish to us as provided herein. Franchisor retains the sole right to approve any linking to, or other use of, the Art Van website. In addition to these activities, we may also establish an intranet through which downloads of operations and marketing materials, exchanges of franchisee email, System discussion forums and system-wide communications (among other activities) can be effected.

## 9.6   Cooperative Advertising

Franchisor has the right, but not the obligation, to create a Cooperative Advertising program for the benefit of Franchise Stores located within a particular region. The level of your cooperative advertising contribution will be determined by the cooperative, of which you will be a voting member, but that amount may exceed your minimum local advertising obligation under the Franchise Agreement, but in no event will it exceed 5% of gross sales. Your contributions to the advertising cooperative in your region will satisfy your local advertising obligations, so long as they meet the minimum local advertising obligations otherwise contained in this Agreement. Franchisor has the right to determine the composition of all geographic territories and market areas for the implementation of each Cooperative Advertising program and to require that Franchisee participate in such Cooperative Advertising programs when established within Franchisee's region, regardless of Franchisee's position on the formation of such advertising cooperative. If a Cooperative Advertising program is implemented in a particular region, an advertising council of franchisees in that region will be selected to self-administer the Cooperative Advertising program. Franchisee shall participate in the council according to the council's rules and procedures and Franchisee shall abide by the council's decisions. Nevertheless, Franchisor reserves the right, but not the obligation, to change, dissolve or merge such program(s) and/or council(s) at any time. Art Van Furniture Stores operated by us or our affiliates in an area covered by an Advertising Cooperative will contribute to the Advertising Cooperative on the same basis as comparable franchisees and have the same voting rights as any comparable franchisee.

## Article 10 – Training

### 10.1   Initial Training.

FRANCHISOR or its designated representative will make available an initial program to train Franchisee to operate the Franchise Business.  This franchisee training program will be offered for not less than two (2) weeks at FRANCHISOR's home office in Warren, Michigan to which up to two (2) persons (Designated Owners and manager) shall attend without charge to Franchisee. The franchisee training must be completed no less than ninety (90) days prior to the opening of the franchised Store.  The franchisee training attendees must complete the franchisee training to FRANCHISOR's satisfaction.  Franchisee shall be responsible for the costs related to attending this training, including without limitation, wages, benefits, travel, lodging, and other costs incidental to Franchisee's attendance at the franchisee training.  In addition, FRANCHISOR will provide an additional staff training program of approximately two (2) weeks at your site, surrounding the opening of Franchisee's Store. FRANCHISOR will determine the timing for this staff training, but will overlap the opening of Franchisee's Store.  FRANCHISOR shall be responsible for the costs of sending its training staff to Franchisee's Store for the initial staff training, and Franchisee shall be responsible for all costs related to Franchisee's staff's attendance to the staff training at Franchisee's Store.  The attendees of the staff training program just complete the staff training to FRANCHISOR's satisfaction.  Franchisee shall not begin operating the Franchise Business unless a Designated Owner has attended and completed to FRANCHISOR's satisfaction, the franchisee training program.  The persons attending the all initial training programs must sign an agreement relating to confidentiality in the form specified by FRANCHISOR before beginning the training program. Franchisee shall be responsible for any training provided by FRANCHISOR beyond the initial training programs, including FRANCHISOR's costs and expenses related to such training, including without limitation, FRANCHISOR's staff costs of wages, benefits, per diem, travel, lodging, and other expenses related to such training.

### 10.2   Franchisee's Training Program.

After beginning operation of the Franchise Business, Franchisee must establish and maintain a continual program of training for management and staff personnel in accordance with FRANCHISOR's specifications. Each employee of the Franchise Business must complete each part of the specified training program and Franchisee must not employ anyone who refuses or fails to complete each part of the specified training program.

### 10.3   Additional Training, Sales Programs and Meetings.

A Designated Owner (or, if authorized by FRANCHISOR, a manager) must, solely at Franchisee's expense, attend additional training, sales programs and meetings reasonably specified by FRANCHISOR.  This includes but is not limited to annual conventions or conferences and monthly franchise meetings if specified by FRANCHISOR.  FRANCHISOR will give reasonable notice of any additional specified training, sales programs or meetings.  FRANCHISOR may impose a reasonable charge on the Franchisee for any training provided to Franchisee, its managers or employees beyond the initial training program, including seminars and conferences.  Any such fees will be uniform as to all persons attending additional training at that time and will be based on FRANCHISOR's out-of-pocket expenses plus a per diem rate for the training personnel. FRANCHISOR may require Franchisee to complete additional training before offering new products or services from the Franchise Business.  All costs to attend training will be borne by Franchisee, including travel, lodging and meals.

# Article 11 - Confidential Information

### 11.1   Confidential Information Defined.

FRANCHISOR owns and possesses, and on signing of this Agreement Franchisee has the right to possess, certain proprietary and/or confidential information relating to developing and operating a Store (the "Confidential Information").  The Confidential Information includes, but is not limited to:

(a)   Operations Manuals, training methods, operating methods, policies, procedures, systems and data;

(b)   Knowledge and experience relating to Stores;

(c)   Advertising programs and marketing techniques used in developing and operating Stores;

(d)   All information regarding the identities and business transactions of customers and suppliers;

(e)   Computer software and similar technology that has been or may be developed by or for FRANCHISOR or its agents, which is proprietary to FRANCHISOR, including, without limitation, digital passwords and identifications and any source code of, and data, reports, and other printed materials generated by, the software or similar technology;

(f)   Knowledge of the operating results and financial performance of Stores;

(g)   Other aspects of the Franchise System now or later revealed to Franchisee under this Agreement and all changes and enhancements in the Franchise System, even if developed by Franchisee.

(h)   Other property that FRANCHISOR describes as being Confidential Information or trade secrets of the Franchise System.

### 11.2   Ownership and Use of Confidential Information.

Franchisee acknowledges that FRANCHISOR owns the Confidential Information and agrees that Franchisee will not acquire any interest in the Confidential Information, other than the right to use it as FRANCHISOR specifies solely for the purpose of establishing and operating the Franchise Business during the term of this Agreement.  Franchisee acknowledges and agrees that the Confidential Information is proprietary to FRANCHISOR and is disclosed to Franchisee in confidence only on the condition that Franchisee and its shareholders, officers, directors, partners, members, owners, investors, employees and agents agree that they will:

(a)   Not use the Confidential Information in any business or capacity other than in the Franchise Business as authorized by this Agreement, both during the term of this

Agreement and after expiration or termination of this Agreement for as long as the Confidential Information is not generally known in the industry;

(b)     Keep each item deemed to be part of Confidential Information absolutely confidential, both during the term of this Agreement and after expiration or termination of this Agreement for as long as the item is not generally known in the industry;

(c)     Not make unauthorized copies of any Confidential Information disclosed via electronic medium or in written or other tangible form and not remove any Confidential Information from the Franchise Location;

(d)     Adopt and implement procedures to prevent unauthorized use or disclosure of Confidential Information, including, without limitation, restricting its disclosure to Franchisee's employees; and

(e)     Require Franchisee's employees and agents to sign an agreement relating to confidentiality in the form specified by FRANCHISOR before revealing any aspect of the Confidential Information to the employee or agent.  FRANCHISOR has the right to be a third party beneficiary of those agreements with independent enforcement rights.

**11.3   Development of New Proprietary or Confidential Information.**
All ideas, concepts, techniques, improvements or materials that relate to or enhance the Franchise Business or the Franchise System, whether or not protectable intellectual property and whether created by or for FRANCHISOR or by or for Franchisee, must be promptly disclosed to FRANCHISOR and will be FRANCHISOR's sole and exclusive property, part of the Franchise System, and works made-for-hire for FRANCHISOR.  Franchisee hereby assigns ownership of the intellectual property, and all related rights to it, to FRANCHISOR to the extent that any intellectual property does not qualify as a "work made-for-hire" for FRANCHISOR.  Franchisee agrees to take whatever action (including signing an assignment or other documents) that FRANCHISOR requests to evidence FRANCHISOR's ownership in the intellectual property.

**11.4   Expiration, Termination or Transfer of this Agreement.**
Franchisee agrees that when this Agreement expires, is terminated, or on the transfer of the Franchise Business, Franchisee will immediately cease using any and all of the Confidential Information in any business or otherwise, and return to FRANCHISOR all copies of all Confidential Information that Franchisee has in its possession.  Franchisee will be liable to FRANCHISOR for any use of the Confidential Information not authorized by this Agreement.

# Article 12 – Restrictions on Competition

**12.1   Covenant Not to Compete During Term.**
With exception of an existing retail furniture store owned and operated by Franchisee at the time of execution of this Agreement, which will be used as the premises for operation of an AVF Franchise Business, Franchisee, its shareholders, officers, directors, partners, members, owners, investors, consultants and spouses must not, during the term of this Agreement, have any interest in, as an owner, shareholder, member, director, officer, manager, employee, consultant, representative or agent, or in any other capacity, or otherwise engage in, any "Competing Business" (defined in Section

12.3), (except other Stores operated under franchise agreements entered into with FRANCHISOR), or in any business or entity that franchises, licenses, or otherwise grants to others the right to operate a Competing Business, unless otherwise agreed in writing by FRANCHISOR.

## 12.2   Other Restrictions During Term.

Franchisee, its shareholders, members, officers, directors, partners, owners, investors, consultants and spouses must not, during the term of this Agreement: (a) divert or attempt to divert any business or customer of the Franchise Business or any other Store to any Competing Business by direct or indirect inducements or otherwise; (b) employ or seek to employ any person who was, at the time, employed by FRANCHISOR or its affiliates or by another Store, or directly or indirectly induce any person to leave their employment with FRANCHISOR or its affiliates or with another Store; or (c) sponsor, appoint or encourage or influence or promote friends, relatives or associates to operate a Competing Business.

## 12.3   Definition of Competing Business.

For purposes of this Agreement, a "Competing Business" includes any business that is the same or similar to the Franchise Business and Store licensed to Franchisee, including but not limited to a business that sells home and office furniture, mattresses, flooring, window treatments, electronics, appliances and other related items offered by FRANCHISOR and Stores now or in the future.

## 12.4   Acknowledgements and Agreements Relating to Restrictions on Competition.

Franchisee acknowledges and agrees that the restrictions contained in this Article are fair and reasonable. The parties have attempted to limit Franchisee's right to compete only to the extent necessary to protect the reasonable competitive business interests of FRANCHISOR and its franchisees. If the above restrictions or any part of these restrictions are invalid, this Article will be considered as imposing the maximum restrictions allowed under the applicable state law in place of the invalid restriction or part of the restriction. In addition, FRANCHISOR reserves the right to reduce the scope of these provisions without Franchisee's consent, at any time, effective immediately on notice to Franchisee.

## 12.5   Covenant Not to Compete After Termination or Expiration of Franchise Term.

For two (2) years following the termination or expiration of this Agreement, whether by lapse of time or by other cause, sale, and/or assignment of the franchise granted under this Agreement or the Franchise Business or by purchase by FRANCHISOR of all or substantially all of the assets of Franchisee pursuant to this Agreement, Franchisee shall not, directly, or indirectly, either as a shareholder, member, officer, director, partner, owner, investor, consultant, or spouse, engage in any other business or Store that is a Competing Business or is similar to, or competitive with the business of the nature and type described under this Agreement within fifty (50) miles of (i) Franchisee's former Protected Territory, (ii) the Protected Territory of any other AVF franchisee, or (iii) any company owned of affiliate owned AVF Businesses selling AVF Products.

Franchisee acknowledges that if Franchisee should violate the provisions of this section with respect to the engagement in a Competing Business during the restriction period, then the

period for which the prohibition stated herein shall be applicable and shall be extended until two (2) years following the date Franchisee ceases all activities that are in violation of such provision.

## Article 13 - Transferability

### 13.1    General Rule.

This Agreement is personal to Franchisee or to the owners of Franchisee if Franchisee is a corporation, partnership, limited liability company or other entity. Accordingly, neither Franchisee nor any person owning any direct or indirect ownership or equity interest in Franchisee, may, without FRANCHISOR's prior written consent, directly or indirectly or contingently, whether voluntarily or by operation of law, sell, assign, transfer, convey, give away, pledge, mortgage or otherwise encumber any interest in: (a) this Agreement; (b) the Franchise Business or any of the assets of the Franchise Business; (c) the Franchise Location; or (d) any equity or voting interest in Franchisee. Any such act or event described above in this Section or any other act defined as a transfer elsewhere in this Agreement will be referred to as a "Transfer." Any permitted Transfer must only be made in accordance with the provisions of this Article 13. Franchisee does not have the right to sublicense any of the rights granted by this Agreement. Any attempted Transfer not in accordance with this Agreement will have no effect and will constitute a breach of this Agreement.

### 13.2    Conditions of FRANCHISOR'S Consent to Transfer; Right of First Refusal.

Before any Transfer, Franchisee or any person owning an interest in Franchisee, or another appropriate person, must give written notice of the proposed Transfer to Franchisor, setting forth in detail the nature of the items to be transferred, the name, address and background of the proposed transferee, the consideration for the Transfer and any other information that FRANCHISOR may reasonably require. This notice must also include a copy of any agreements relating to the proposed Transfer. After reviewing the information, FRANCHISOR will determine, in accordance with the provisions of this Agreement and any procedures specified in the Operations Manual, whether to grant its consent to the Transfer. If these conditions are met, FRANCHISOR will not unreasonably withhold its consent to a proposed Transfer of the type permitted by this Agreement.

Before FRANCHISOR consents to a proposed Transfer, the following conditions must be fulfilled:

(a)    The proposed transferee must follow the same application procedures as a new franchisee and must meet the same standards of character, business experience, financial strength, credit standing, reputation, business ability, experience, etc. as FRANCHISOR has set for any new franchisee.

(b)    The terms of the proposed transfer must not place unreasonable burdens on the proposed transferee.

(c)    Franchisee must be in full compliance with all provisions of this Agreement and must pay FRANCHISOR all monies owing and must sign at the time of Transfer an agreement terminating or transferring this Agreement (at FRANCHISOR's option) and releasing FRANCHISOR and its affiliates and their owners, directors, members, employees and agents from any claims.

(d)     The proposed transferee must execute FRANCHISOR's standard confidentiality agreement and satisfactorily complete FRANCHISOR's initial training program.  FRANCHISOR may impose a reasonable charge for this training program.

(e)     The proposed transferee must, at FRANCHISOR's option: (i) sign with FRANCHISOR a Franchise Agreement on the standard form in use by FRANCHISOR at the time of Transfer, which agreement would have a term equal to the term remaining under this Agreement, or (ii) sign, with Franchisee, an assignment and assumption satisfactory to FRANCHISOR, whereby the proposed transferee would be entitled to all of Franchisee's rights under this Agreement and assume all of Franchisee's obligations under this Agreement.

(f)     The proposed transferee must pay FRANCHISOR a transfer fee in an amount equal to 25% of the initial franchise fee being charged by FRANCHISOR at the time of the transfer, which would be due at the time of execution of a consent by FRANCHISOR to the proposed Transfer.  This fee is not refundable.

(g)     The proposed transferee must agree that, within 90 days of the transfer, it will take any action specified by FRANCHISOR to make the Franchise Business comply with current appearance, equipment and signage requirements.

(h)     Franchisee and the proposed transferee must comply with any other standard procedures specified by FRANCHISOR.

(i)     Franchisee must execute FRANCHISOR's standard general release agreement.

Franchisee acknowledges that the conditions listed above are necessary for protection of the Franchise Marks and Franchise System and do not impose unreasonable restrictions on a Transfer.

In addition to the above, if Franchisee desires to sell the franchise to a bona fide buyer and assign this Agreement, it shall serve upon FRANCHISOR a written notice setting forth all of the terms and conditions of the proposed sale and assignment and all available information concerning the proposed buyer.  FRANCHISOR shall have a right of first refusal ("**Right of First Refusal**") to purchase the franchise for itself or its nominee upon the same terms and conditions specified in Franchisee's notice, except that, in FRANCHISOR's discretion, it may substitute cash for any deferred payment included in the buyer's offer.   To exercise its right of first refusal, FRANCHISOR must give Franchisee written notice of its election by no later than thirty (30) days following its receipt of Franchisee's notice. If FRANCHISOR either fails to give timely notice, or gives notice that it declines to exercise its right, Franchisee may thereafter sell the business to the proposed buyer, but not at a lower price nor on terms which materially vary from those offered to Franchisee and provided, further, that all of the conditions to such sale set forth in this Section 13.2 are satisfied, including FRANCHISOR's approval of the proposed buyer's qualifications.  If FRANCHISOR's consent to the proposed sale is granted, but the franchise is not sold to the buyer within six (6) months from the date it is first offered to FRANCHISOR, then Franchisee must re-offer to sell it to FRANCHISOR prior to a sale to any third party.

### 13.3    Transfer on Death or Incapacity.

If Franchisee or the last surviving owner of Franchisee (if Franchisee is a corporation, partnership, limited liability company or other entity) dies or becomes incapacitated, Franchisee's or its owner's rights under this Agreement will pass to the estate, heirs, devisees or legal representatives of Franchisee or its owner (collectively referred to in this Agreement as the "estate"). The estate may continue operation of the Franchise Business if: (a) the Franchise Business is not closed for more than 7 business days and is thereafter operated in accordance with applicable law; (b) the estate provides a qualified individual acceptable to FRANCHISOR to manage and operate the Franchise Business on a full time basis; (c) the manager attends and successfully completes FRANCHISOR's training program at the estate's expense; and (d) the manager assumes full time operation of the Franchise Business within 90 days of the date Franchisee or its owner dies or becomes incapacitated. If the estate fails to designate an acceptable manager or the designated manager fails to attend and satisfactorily complete the training program and to assume the full time operation of the Franchise Business within 90 days of the death or incapacity, then the estate must sell the estate's interest in the Franchise Business or in this Agreement within 180 days of the date of death or incapacity. Any sale will require FRANCHISOR's consent under Section 13.2

After the date of death or incapacity, until a trained manager assumes full time operational control of the Franchise Business or until the estate's interest in the Franchise Business or in this Agreement is sold, FRANCHISOR may, at its option, assume control of and operate the Franchise Business. During any period that FRANCHISOR operates the Franchise Business, FRANCHISOR may deduct its expenses for payroll, travel, lodging, meals and all other expenses and fees from the Franchise Business's revenues. Any remaining revenues of the Franchise Business, after paying all other operational expenses of the Franchise Business will be paid to the estate. Any deficiency in amounts due to FRANCHISOR under this Section or any deficiencies from operation of the Franchise Business must be paid by the estate within 10 days of a notice of deficiency from FRANCHISOR. FRANCHISOR is not obligated to operate the Franchise Business. If FRANCHISOR does operate the Franchise Business, FRANCHISOR will not be responsible for any operational losses of the Franchise Business, nor will FRANCHISOR be obligated to continue operation of the Franchise Business.

### 13.4    Transfers to Controlled Entities or Trust.

If Franchisee is in full compliance with this Agreement, the Agreement may be assigned to a corporation, partnership, other entity in which Franchisee owns and will continue to own a majority of the issued and outstanding stock, partnership interest, or other ownership interests and in which Franchisee will act as its principal executive officer or manager ("Controlled Entity"), or a Trust controlled by Franchisee, provided that:

(a)    All owners of the Controlled Entity execute this Agreement and agree to be personally bound, jointly and severally, by all of the provisions of this Agreement;

(b)    The Controlled Entity agrees to be bound by all the provisions of this Agreement and to assume and discharge all of Franchisee's obligations under this Agreement; and

(c)    The Controlled Entity will have no right to engage in a Transfer except in accordance with the provisions of Article 13 of this Agreement.

In the event the legal interest of member or shareholder is assigned to a Trust of such individual for purposes of estate planning, such event shall not be deemed to be a Transfer under this Agreement.

**13.5   Assignment by FRANCHISOR.**
    This Agreement is fully assignable by FRANCHISOR and will inure to the benefit of any assignee or other legal successor to the interests of FRANCHISOR.  FRANCHISOR may sell, assign, discount or otherwise transfer any rights under this Agreement or any other assets of FRANCHISOR or its owners, without notice to or approval of Franchisee or any other Franchisee, at any time. However, Franchisor will remain liable for the performance of its obligations under this Agreement or will make provision for the performance of those obligations by the assignee, to the extent required by applicable law.

## Article 14 – Default and Termination

**14.1   Default by FRANCHISOR; Termination by Franchisee.**
    FRANCHISOR will be considered in default of this Agreement if FRANCHISOR breaches any material obligations of FRANCHISOR under this Agreement.  Franchisee may terminate this Agreement only if: (a) Franchisee is in full compliance with all terms of this Agreement; (b) Franchisee provides written notice to FRANCHISOR specifying a material default of this Agreement by FRANCHISOR and the proposed date of termination; and (c) FRANCHISOR has committed the default and has not cured the default within 30 days of written notice from Franchisee of the default, or longer period if FRANCHISOR is unable to cure within 30 days, but commences such cure within 30 days and diligently pursues to completion.  Written notice from Franchisee of the default must specify in writing with particularity the nature of the default and the steps Franchisee requests that FRANCHISOR take to cure the default. FRANCHISOR will have not less than 30 days to cure the default.  Failure of Franchisee to comply with the provisions of this Section will result in any attempt to terminate being deemed null and void and without legal effect.

**14.2   Default by Franchisee; Termination by FRANCHISOR.**
    Franchisee will be considered in default of this Agreement on the occurrence of any of the events listed in Sections 14.3 and 14.4 or elsewhere in this Agreement.  FRANCHISOR has the right to terminate this Agreement before its expiration only for good cause and only in accordance with the requirements of Sections 14.3 or 14.4 below.  Good cause for termination by FRANCHISOR includes any default of this Agreement by Franchisee.

**14.3   Events of Default by Franchisee; No Right to Cure.**
    Any of the following events will constitute a default by Franchisee and good cause for termination of this Agreement by FRANCHISOR.  On the happening of any of these events, FRANCHISOR may, at its option, terminate this Agreement effective on delivery of written notice to Franchisee without affording Franchisee an opportunity to cure (except as may be required by applicable law).

        (a)    Franchisee fails to enter into a lease or sublease for a Franchise Location as required by this Agreement.

(b)     FRANCHISOR determines that Franchisee cannot, will not or has not completed FRANCHISOR's pre-opening training programs to the satisfaction of FRANCHISOR, or fails to demonstrate the qualities and abilities that FRANCHISOR deems necessary for the successful operation of the Franchise Business.

(c)     Franchisee is unable to obtain, without extraordinary administrative proceedings or litigation, any permit or license necessary to develop and open the Franchise Business.

(d)     Any material misrepresentation, dishonesty or fraud by Franchisee to or against FRANCHISOR or its agents or affiliates, or suppliers or customers of the Franchise Business.

(e)     A substantial number of complaints from customers relating to products or services provided by Franchisee or the acts or omissions of Franchisee.

(f)     Any assignment or transfer of this Agreement or the Franchise Business without complying with Article 13 of this Agreement.

(g)     The conviction of, or plea of guilty or no contest by Franchisee or a Designated Owner to: (i) a crime, offense or misconduct for which the minimum penalty includes imprisonment for more than one year; or (ii) any crime, offense or misconduct for which the minimum penalty includes imprisonment for one-year or less that involves fraud or dishonesty or is in any other way relevant to the operation of the Franchise Business.

(h)     Franchisee has received three or more prior notices of default and/or to terminate, whether or not for the same or similar default, during any consecutive 12-month period.

(i)     Franchisee has failed to attend two or more required monthly meetings within any consecutive 12-month period.

(j)     Any abandonment by Franchisee of the Franchise Business.  Abandonment will be conclusively presumed if Franchisee fails to open the Franchise Business for business for a period of three (3) consecutive business days without the prior written consent of FRANCHISOR or fails to open the Franchise Business for business for a total of five (5) business days within a 90 day period.

(k)     Franchisee operates the Franchise Business in a manner that presents a health or safety hazard to its customers, employees, or the public, and the same cannot by its nature be cured within a reasonable time period.

(l)     Intoxication, illegal drug use or other substance abuse by Franchisee or a Designated Owner that interferes with the operation of the Franchise Business.

(m)     Any conduct by Franchisee that reflects materially and adversely on the operation or reputation of the Franchise Marks or Franchise System.

(n)     Adjudication of bankruptcy of Franchisee, the insolvency of the Franchise Business, appointment of a receiver or trustee to take charge of the Franchise Business by a court of competent jurisdiction or the general assignment by Franchisee for the benefit of creditors.

## 14.4   Events of Default by Franchisee; Right to Cure.

Any of the following events will constitute a default by Franchisee and good cause for termination of this Agreement by FRANCHISOR.   On the happening of any of these events, FRANCHISOR may, at its option, terminate this Agreement effective on written notice to Franchisee and Franchisee's failure to cure the defaults during a cure period set forth below:

(a)     Failure of Franchisee to promptly pay its obligations to FRANCHISOR, an affiliate of FRANCHISOR or third party suppliers as they become due, or the occurrence of any other default under a lease or finance agreement for the real or personal property involved in the Franchise Business.

(b)     Failure of Franchisee to operate in accordance with the uniform standards of FRANCHISOR, failure of Franchisee to meet current minimum performance standards according to the provisions of the Operations Manual or failure to permit store evaluations and inspections by FRANCHISOR's representatives.

(c)     Failure of Franchisee to purchase products and services for use in the Franchise Business from Approved Suppliers.

(d)     If Franchisee is an entity other than a natural person, any dispute, disagreement or controversy among the stockholders, members, partners, directors, officers or managers of Franchisee, which materially and adversely affects the ownership, operation, management or business of the Franchise Business.

(e)     Any other material breach of this Agreement by Franchisee or a material breach by Franchisee or any corporation, partnership, limited liability company or other entity controlling, controlled by or under common control with Franchisee or any of the owners of Franchisee, of any of the terms of any other agreements entered into with FRANCHISOR or its affiliates.

(f)     The cancellation of any guaranty of the obligations of this Agreement by any owner of Franchisee.

(g)     Failure to meet annual sales volume or net operating income requirements set forth by Section 8.16.

Written notice of termination from FRANCHISOR under this Section 14.4 must specify any defaults under this Agreement or other reasons for termination and the date the termination will be effective.   The effective date of termination must be: (i) at least 15 days from the date of notice for

defaults involving the payment of money to FRANCHISOR or its affiliates; and (ii) at least 30 days from the date of notice in all other instances. Termination will be automatically effective without further action by FRANCHISOR on the date specified in the notice as the effective date of termination unless Franchisee completely cures, before the date specified in the notice as the effective date of termination, all the defaults or other reasons for termination specified by FRANCHISOR in the notice.

**14.5  Right to Withhold Products and Support Services on Certain Defaults by Franchisee; Return of Unpaid Product**

If Franchisee commits any of the defaults listed below, FRANCHISOR will have the right to refuse to sell or make available to Franchisee any products, including but not limited to AVF Products, and to cause Approved Suppliers to refuse to sell products to Franchisee and to withhold support services from Franchisee. In addition, FRANCHISOR may, subject to restrictions of applicable state law, access any site where Franchisee's unpaid product is held or stored for the purpose of retrieving such unpaid items. The defaults giving rise to this remedy include: (a) a payment due to FRANCHISOR from Franchisee is more than 30 days past due; (b) Franchisee owes Franchisor's suppliers $10,000 or more in past due payments; or (c) any other default under this Agreement that has not been cured within 30 days of written notice. The remedies set forth in this Section will not be the sole remedies of FRANCHISOR for such defaults and FRANCHISOR may exercise any other remedies, including but not limited to, termination of this Agreement.

## Article 15 - Effect of Termination or Expiration

**15.1  Obligations of Franchisee.**

On expiration or termination of this Agreement for any reason (including termination on a transfer), Franchisee's rights to use the Franchise Marks and the Franchise System and all other rights associated with being an authorized franchisee of FRANCHISOR will cease and Franchisee must do the following:

(a)  Franchisee must immediately and permanently discontinue the use of the Franchise Marks, the Franchise System and any marks and names and logos confusingly similar to the Franchise Marks, and any other materials that may, in any way, indicate that Franchisee is or was a franchisee of FRANCHISOR, or in any way associated with FRANCHISOR.

(b)  Franchisee must immediately discontinue all advertising placed or ordered. Franchisee must remove and deliver to FRANCHISOR all sign faces, advertising and promotional material, stationery, letterhead, forms and any other items bearing the Franchise Marks. Franchisee must bear the cost of sign and other identification removal and the cost of shipping signs and other materials to FRANCHISOR. If Franchisee remains in possession of the Franchise Location, Franchisee must alter the premises to distinguish the premises from the appearance of a Store.

(c)  Franchisee must cease using the Operations Manual and all proprietary business information provided by FRANCHISOR and must return to FRANCHISOR all copies of the Operations Manual and other materials received from FRANCHISOR containing information about the Franchise Business.

(d)      Franchisee must immediately and permanently cease to use all telephone and fax numbers, email addresses, websites, domain names and other comparable electronic identifiers that have been used in the Franchise Business and if requested by FRANCHISOR, must assign all such telephone and fax numbers, email addresses, website addresses, domain names and other comparable electronic identifiers to FRANCHISOR.  Franchisee acknowledges that as between FRANCHISOR and Franchisee, FRANCHISOR has the sole rights to all telephone and fax numbers, email addresses, websites addresses, domain names and other comparable electronic identifiers used in the Franchise Business and all written and online directory listings associated with the Store.  Franchisee authorizes FRANCHISOR, and appoints FRANCHISOR and any officer of FRANCHISOR as its attorney-in-fact, to direct the applicable service providers and all listing agencies to transfer those items to FRANCHISOR or its agent or assignee if Franchisee fails or refuses to do so.  The applicable service providers and all listing agencies may accept the direction in this Agreement as conclusive evidence of the exclusive rights of FRANCHISOR in such telephone and fax numbers, email addresses, website addresses, domain names, other comparable electronic identifiers and directory listings and its authority to direct their transfer.

(e)      Franchisee must cease using any business name containing any of the Franchise Marks and must file an abandonment or discontinuance of the name with the appropriate local, county or state agency.

(f)      Franchisee must immediately pay all sums and debts owing to FRANCHISOR and its subsidiaries and affiliates, whether such sums and debts owing to FRANCHISOR and its subsidiaries and affiliates are evidenced by promissory note, invoice, bill or other writing, and notwithstanding the fact that such sums and debts may not at that time be fully due and payable, such debts being accelerated automatically without further notice to Franchisee.

(g)      Franchisee must sell to FRANCHISOR all or part of Franchisee's inventory or products on hand as of the date of termination or expiration that are uniquely identified with FRANCHISOR, if any, as FRANCHISOR may request in writing before or within 30 days after the date of termination or expiration.  The sales price will be the current published prices then being charged by the manufacturer or supplier to authorized franchisees of FRANCHISOR, not including any costs of storage or transportation paid by Franchisee to bring the goods initially to the Franchise Business, minus all costs incurred or to be incurred by FRANCHISOR to restore the goods or the packaging of the goods to a saleable condition and minus a reasonable allowance for physical deterioration, obsolescence or damage to the extent not restored.

## 15.2    Option to Assume Lease.

If this Agreement terminates or expires for any reason, other than a termination by Franchisee for cause, FRANCHISOR will have the right to assume Franchisee's lease for the Franchise Location.  If FRANCHISOR exercises this right, FRANCHISOR must assume and hold Franchisee harmless from all liability under the lease arising after the assumption by FRANCHISOR.  If the Franchise Location is owned by Franchisee and this Agreement terminates or expires for any reason other than a termination by Franchisee for cause, FRANCHISOR will have the option to lease the Franchise Location on substantially the same terms and conditions contained in Franchisee's lease for the Franchise Location, or, if no lease exists, then on terms and conditions that are commercially

reasonable. The options granted in this Section must be exercised by FRANCHISOR within 30 days of the date of expiration or termination of this Agreement.

**15.3   Option to Purchase Assets;**

If this Agreement expires or terminates for any reason, except termination by Franchisee for cause, FRANCHISOR will have the option, but not the obligation to purchase the assets of the Franchise Business. The purchase price will be the fair value of the assets as agreed by the parties or in the absence of an agreement, as determined by an independent qualified appraiser selected by FRANCHISOR and Franchisee. If FRANCHISOR and Franchisee cannot agree on an independent appraiser, each will select an independent appraiser qualified or certified to make the appraisal. The independent appraisers chosen will then select a third independent appraiser. The third independent appraiser will determine the fair value of the assets and his or her determination will be binding on the parties. The purchase price will be reduced by any current and long-term liabilities of the Franchise Business that FRANCHISOR agrees to assume and any amounts owing to FRANCHISOR by Franchisee. FRANCHISOR must exercise the option granted in this Section within 45 days following the determination of a price for the assets. Closing of the sale must take place within 45 days after FRANCHISOR exercises its option to purchase the assets or a later date, if agreed to by the parties, as necessary to comply with applicable bulk sales or other similar laws.

**15.4   Surviving Obligations.**

Termination or expiration of this Agreement will not affect Franchisee's obligations or liability to FRANCHISOR for amounts owed to FRANCHISOR under this Agreement or for FRANCHISOR's damages attributable to the loss of bargain resulting from termination of this Agreement before its expiration (as set forth in Section 15.5). Also, termination of this Agreement will not affect Franchisee's obligations under Article 6 relating to the Franchise Marks, Section 8.13 relating to indemnification, Article 11 relating to confidentiality, Section 15.3 relating to FRANCHISOR's option to purchase the assets of the Franchise Business, Article 16 relating to dispute resolution and other obligations in this Agreement or any other agreements between Franchisor and third parties, which, by their terms or intent, survive termination or expiration of this Agreement.

**15.5   Damages for Loss of Bargain.**

In addition to any other remedies available to FRANCHISOR, if this Agreement is terminated before its expiration (other than termination by Franchisee for cause), FRANCHISOR will be entitled to recover from Franchisee damages attributable to the loss of bargain resulting from that termination. The parties stipulate and agree that the damages for FRANCHISOR's loss of bargain will be the present value of the royalty fees and Marketing Fund fees that would have been payable to FRANCHISOR for the lesser of: (i) the balance of the term of this Agreement if this Agreement had not been terminated; or (ii) 36 months. The parties agree that the total amount of royalty fees and Marketing Fund fees that would have been payable will be calculated utilizing annual Gross Sales equal to the average annual Gross Sales of the Franchise Business for the two year period [or such lesser period if Franchisee was not in operation for a full two year period] immediately preceding the date of termination. For the purposes of this Section, Gross Sales will be calculated based on Gross Sales reported by Franchisee or as actually determined by an audit of Franchisee's business. If Franchisee has failed or refused to report Gross Sales for any part of its operation before termination, FRANCHISOR may reasonably estimate those Gross Sales.

The parties acknowledge and agree that the actual damages that would be sustained by FRANCHISOR if this Agreement is terminated before its expiration are incapable of calculation at the time of execution of this Agreement. The parties further acknowledge and agree that the damages set forth in this Section are a reasonable estimation of those damages.

**15.6   Remedies.**

Termination or expiration of this Agreement and/or enforcement of the provisions of this Article will not affect or prejudice any other rights or remedies of FRANCHISOR for breach of this Agreement by Franchisee whether those rights and remedies are contained in this Agreement or otherwise provided by law or equity.

## Article 16 – Dispute Resolution; Law and Jurisdiction; Injunctive Relief; Costs of Enforcement; Jury Waiver; Limitations of Claims

**16.1   Negotiation.**

Except for actions described in Section 16.6, the parties will try to resolve all disputes by having the Franchisee or a Designated Owner negotiate with an executive officer of FRANCHISOR to resolve the dispute, including at least one face-to-face meeting. The parties agree to conduct these negotiations in good faith and to use their best efforts to resolve any such disputes. If the parties have not resolved the dispute within 30 days after beginning these negotiations, then either party may demand arbitration of the dispute in accordance with Sections 16.2 and 16.3.

**16.2   Binding Arbitration.**

Except for actions described in Section 16.7, all controversies, disputes or claims between: (a) FRANCHISOR and/or its officers, directors, members, managers, employees, agents or representatives; and (b) Franchisee, and/or its officers, directors, members, managers, employees, agents or representatives; arising out of or related to this Agreement or any other agreement between Franchisor and Franchisee or any provision of such agreement, or FRANCHISOR's relationship with Franchisee, or any other dispute between Franchisor and Franchisee, must be submitted for binding arbitration in accordance with the provisions of this Article 16 on the demand of either party. A party may demand arbitration for a dispute only after complying with the duty to negotiate contained in Section 16.1. Except as otherwise provided in this Article 16, such arbitration proceeding must be conducted in accordance with the commercial arbitration rules (the "Rules") of the American Arbitration Association ("AAA"). The Federal Arbitration Act (9 U.S.C. §§ 1 et seq.) (the "Act") and not any state arbitration law will govern all matters relating to arbitration.

The provisions of this Article 16 are intended to benefit and bind certain third party non-signatories and will continue in full force and effect after and notwithstanding the expiration or termination of this Agreement.

**16.3   Arbitration Procedures.**

Any matter will be adjudicated before one (1) arbitrator unless FRANCHISOR elects for the dispute to be decided before a panel of three (3) arbitrators. The arbitration will be administered and conducted in the office of the AAA in or closest to Southfield, Michigan. The parties desire that at least one of the arbitrators be an attorney familiar with franchise matters. The arbitrator will follow the Rules except as otherwise provided in this Section. The arbitrator will comply with the Federal

Rules of Evidence; will grant limited discovery consisting of written interrogatories and requests for production of documents eliciting only relevant evidence; will provide for the exchange of witness lists and exhibit copies; and will conduct a pretrial and rule on dispositive motions. Each party will have the right to request the arbitrator to make findings of specific factual issues.

FRANCHISOR and Franchisee agree to be bound by the provisions of any limitation on the period of time in which claims must be brought under applicable law or this Agreement, whichever expires earlier. FRANCHISOR and Franchisee further agree that, in connection with any such arbitration proceeding, each must submit or file any claim that would constitute a compulsory counterclaim (as defined by Rule 13 of the Federal Rules of Civil Procedure) within the same proceeding as the claim to which it relates. Any such claim that is not submitted or filed as described above will be forever barred.

### 16.4   Decision of Arbitrator.

The arbitrator will have the right to award or include in the award any relief that the arbitrator deems proper under the circumstances, including, without limitation, money damages (with interest on unpaid amounts from the date due), specific performance, injunctive relief and attorney's fees and costs, provided that the arbitrator will not have the right to award special, exemplary or punitive damages. The decision of the arbitrator will be final and binding on the parties, subject only to appeal rights under the Act, and a judgment by a court of competent jurisdiction may be entered in accordance with the decision.

### 16.5   Applicable Law.

This Agreement takes effect on its acceptance and execution by FRANCHISOR in Michigan, and, except for the applicability of the Federal Arbitration Act, and except to the extent this Agreement or any particular dispute is governed by the U.S. Trademark Act of 1946 or other federal law, this Agreement shall be governed by and construed in accordance with the laws of the State of Michigan (without reference to its conflict of laws principles). References to any law refer also to any successor laws and to any published regulations for such law as in effect at the relevant time. References to a governmental agency also refer to any regulatory body that succeeds the function of such agency. The parties agree, however, that if Franchisee's Furniture Store is not in Michigan and if Franchisee is not a resident of the state of Michigan, the Michigan Franchise Investment Law shall not apply to this transaction, the relationship between Franchisor and Franchisee or this Agreement. In the event of any conflict of law, the laws of Michigan will prevail, without regard to the application of Michigan conflict-of-law rules. If, any provision of this Agreement would not be enforceable under the laws of Michigan, and if Franchisee's business is located outside of Michigan and such provision would be enforceable under the laws of the state in which Franchisee's business is located, then such provision will be interpreted and construed under the laws of that state.

### 16.6   Injunctive Relief; Venue.

Notwithstanding Sections 16.1 and 16.2, FRANCHISOR will have the right, without the posting of any bond or security and without the need to prove irreparable injury, to obtain specific enforcement of the terms of this Agreement from a court of competent jurisdiction, by temporary or permanent injunctions or other equitable relief. Each party stipulates to the jurisdiction of the Macomb County Circuit Court or Federal District Court in Detroit with regard to this Section 16. FRANCHISOR will have the right, without limitation, to obtain injunctive relief to prevent

Franchisee from engaging in the following acts, which Franchisee acknowledges would cause irreparable harm to FRANCHISOR: (a) using any of the rights franchised by this Agreement, including use of the Franchise Marks, in any manner not authorized in this Agreement; (b) engaging in operations in violation of the in-term restrictions on competition set forth in Article 12; (c) disclosing to any person or using the trade secrets or confidential information of FRANCHISOR in violation of the terms of this Agreement; (d) transferring or assigning this Agreement or the assets of the Franchise Business without complying with this Agreement; (e) engaging in acts or practices in violation of applicable laws and regulations or that are fraudulent, dishonest or create health or other hazards to the public; or (f) significantly impairing the goodwill associated with FRANCHISOR. FRANCHISOR's rights to obtain injunctive relief are in addition to all other remedies available to FRANCHISOR under applicable law.

**16.7    Costs of Enforcement.**

If any arbitration or legal action or other proceeding is begun for the enforcement of this Agreement, or for an alleged dispute, breach, default or misrepresentation under any term of this Agreement, then FRANCHISOR, if FRANCHISOR is the prevailing party, is entitled to recover reasonable pre-institution and post-institution attorney's fees, court costs, and all expenses even if not taxable as court costs (including all fees and expenses incident to appellate, bankruptcy and post-judgment proceedings), incurred in the action or proceeding in addition to all other relief to which FRANCHISOR is entitled. Attorney's fees includes paralegal fees, administrative costs, investigative costs, costs of expert witnesses, court reporter fees, sales and use taxes, if any, and all other charges billed by the attorney to the prevailing party. If FRANCHISOR engages legal counsel because of Franchisee's failure to pay when due any monies under this Agreement or submit when due any reports, information or supporting records, or for any failure to otherwise comply with this Agreement, Franchisee must reimburse FRANCHISOR on demand for all of the above listed expenses FRANCHISOR incurs.

**16.8    Jury Waiver; Time Period for Bringing Claims; Limitation of Damages.**

FRANCHISOR AND FRANCHISEE IRREVOCABLY WAIVE TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM, WHETHER AT LAW OR IN EQUITY, BROUGHT BY EITHER OF THEM AGAINST THE OTHER, WHETHER OR NOT THERE ARE OTHER PARTIES IN SUCH ACTION OR PROCEEDING.

ALL CLAIMS ARISING UNDER THIS AGREEMENT OR FROM THE RELATIONSHIP BETWEEN THE PARTIES ARE BARRED UNLESS AN ACTION IS FILED AND TIMELY SERVED ON THE OPPOSING PARTY WITHIN ONE YEAR FROM THE DATE THE PARTY KNEW OR SHOULD HAVE KNOWN OF THE FACTS CREATING THE CLAIM, EXCEPT TO THE EXTENT ANY APPLICABLE LAW OR STATUTE PROVIDES FOR A SHORTER PERIOD OF TIME TO BRING A CLAIM OR AS OTHERWISE REQUIRED BY LAW.

FRANCHISEE WAIVES IN ANY JUDICIAL ACTION, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY RIGHT TO OR CLAIM OF ANY SPECIAL, PUNITIVE OR EXEMPLARY DAMAGES AGAINST FRANCHISOR AND AGREES THAT IN THE EVENT OF A DISPUTE BETFRANCHISOREN THEM, FRANCHISEE WILL BE LIMITED TO THE RECOVERY OF ANY ACTUAL DAMAGES SUSTAINED BY FRANCHISEE.

**16.9   Survival.**

The provisions of this Article 16 will continue in full force and effect subsequent to and notwithstanding the expiration or termination of this Agreement.

## Article 17 – Additional Provisions

**17.1   Independent Contractor.**

Franchisee is and will be considered an independent contractor with control and direction of its business and operations limited only by the conditions set forth in this Agreement or otherwise specified by FRANCHISOR. No agency, employment, fiduciary, legal representative, joint venturer, partner, employee, servant, partnership or joint venture or other special relationship between the parties for any other purpose whatsoever, is created by this Agreement and neither party has the right to act on behalf of the other. The parties acknowledge that this Agreement does not create a fiduciary relationship between the parties. Without limiting the generality of the foregoing, Franchisee acknowledges that FRANCHISOR has no responsibility to ensure that the Store is developed and operated in compliance with all applicable laws, ordinances, and regulations and that FRANCHISOR shall have no liability in the event the development or operation of the Store violates any law, ordinance, or regulation. Franchisee's business is, and shall be kept, totally separate and apart from any that may be operated by FRANCHISOR. In all public records, in relationships with others, and on letterhead and business forms, electronic communications, bulletins and posters to Franchisee's employees, paychecks, checks, and other communications to customers, Franchisee shall indicate that Franchisee is solely a franchisee of FRANCHISOR.

Franchisee acknowledges and agrees that, except as otherwise provided in this Agreement, FRANCHISOR does not have authority to exercise control over the means or manner in which Franchisee operates it business or Store. All Store operations will be determined by Franchisee in its own judgment, subject only to legal requirements, the terms of this Agreement, and the standard, procedures and policies FRANCHISOR prescribes for the preservation of the goodwill associated with the Marks.

None of Franchisee's employees will be considered FRANCHISOR's employees. Neither Franchisee nor any of its employees whose compensation Franchisee pays may in any way, directly or indirectly, expressly or by implication, be construed to be FRANCHISOR's employee for any purpose, most particularly with respect to any mandated or other insurance coverage, tax or contributions, or requirements pertaining to withholdings, levied or fixed by any local, state, or federal government agency. FRANCHISOR shall not have the power to hire or fire Franchisee's employees. Franchisee expressly agrees, and will never contend otherwise, that FRANCHISOR's authority under this Agreement to certify certain of Franchisee's employees for qualification to perform certain functions for the Store does not directly or indirectly vest in FRANCHISOR the power to hire, fire, or control such employee. Franchisee acknowledges and agrees, and will never contend otherwise, that Franchisee alone will exercise day-to-day control over all operations, activities and elements of the Store and that under no circumstance shall FRANCHISOR do so or be deemed to do so. Franchisee further acknowledges and agrees, and will never contend otherwise, that the various requirements, restrictions, prohibitions, specifications and procedures of the Franchise System which Franchisee is required to comply with under this Agreement, whether set forth in the Confidential Operations Manual or otherwise, do not directly or indirectly

constitute, suggest, infer or imply that FRANCHISOR controls any aspect or element of the day-to-day operations of the Store, which Franchisee alone controls, but only constitute standards Franchisee must adhere to when exercising its control of the day-to-day operations of the Store. Except as expressly provided in this Agreement, FRANCHISOR may not control or have access to Franchisee's funds or the expenditure of Franchisee's funds or in any other way exercise dominion or control over the Store. Except as otherwise expressly authorized by this Agreement, neither party will make any express or implied agreements, warranties, guarantees or representations or incur any debt in the name of or in behalf of the other party, or represent that the relationship between FRANCHISOR and Franchisee is other than that of franchisor and franchisee. FRANCHISOR does not assume any liability, and will not be considered liable, for any agreements, representations, or warranties made by Franchisee which are not expressly authorized under this Agreement. FRANCHISOR will not be obligated for any damages to any person or property which directly or indirectly arise from or relate to Franchisee's operation of the Store. Franchisee shall have no right or power to, and shall not, bind or obligate us or our affiliates in any way or manner, nor represent that Franchisee has any right to do so.

Franchisee shall take such steps as are necessary to ensure that its employees do not violate FRANCHISOR'S policies relating to the use of any electronic medium, including, but not limited to, prohibiting employees from posting any information relating to FRANCHISOR, the Franchise System, or the Marks without Franchisor's prior written approval. Franchisee shall be solely responsible for all employment decisions of the Store, including, without limitation, those related to hiring, firing, remuneration, benefits, reviews, personnel policies, benefits, record keeping, supervision, safety, security, and discipline, and regardless of whether Franchisee received advice or recommendations from FRANCHISOR on such subjects. If any recommendations regarding employees were received from FRANCHISOR, they shall be considered to be suggestions only.

**17.2  Waivers.**
The failure or delay of any party at any time to require performance by another party of any provision of this Agreement, even if known, will not affect the right of that party to require performance of that provision or to exercise any right under this Agreement. The failure or delay of FRANCHISOR to require performance by another franchisee of any provision of its franchise agreement, even if known, will not affect the right of FRANCHISOR to require performance of that provision in this Agreement or to exercise any right under this Agreement. Any waiver by any party of any breach of any provision of this Agreement is not a waiver of any continuing or later breach of that provision, a waiver of the provision itself, or a waiver of any right under this Agreement. No notice to or demand on any party in any case, of itself, entitles that party to any other notice or demand in similar or other circumstances.

**17.3  Consents, Approvals and Satisfaction.**
Whenever FRANCHISOR's consent or approval is required under this Agreement, consent or approval will not be unreasonably withheld or delayed unless specifically stated in this Agreement to the contrary. All consents or approvals required of FRANCHISOR are not binding on FRANCHISOR unless the consent or approval is in writing and signed by the president or a managing member of FRANCHISOR. FRANCHISOR's consent or approval, whenever required, may be withheld if Franchisee is in default under this Agreement. Where the satisfaction of FRANCHISOR is required under this Agreement, unless the Agreement expressly states otherwise, the satisfaction is determined in FRANCHISOR's sole discretion. FRANCHISOR will not be liable

to Franchisee in any manner for providing or failing to provide or for any delay in providing any waiver, approval, assistance, consent or suggestion to Franchisee. Franchisee waives any claims against FRANCHISOR for such liability.

**17.4  Third Parties.**

Except as provided in this Agreement to the contrary for any affiliates or franchisees of FRANCHISOR, nothing in this Agreement, whether expressed or implied, is intended to confer any rights under this Agreement on any person other than the parties and their respective personal representatives, other legal representatives, heirs, successors and permitted assigns.

**17.5  Cumulative Remedies.**

All remedies, either under this Agreement or by law or otherwise afforded, will be cumulative and not alternative.

**17.6  Notices.**

Notices under this Agreement must be in writing signed by the party serving the same and must be sent by: (a) registered or certified mail, return receipt requested, postage pre-paid, in which case the notice will be complete two days after mailing; (b) overnight courier service, in which case the notice will be complete one day after delivery to the overnight courier; or (c) facsimile with proof of completion, in which case the notice will be complete one day after proof of completion. The notice must be sent to the address or facsimile number set forth below or at such address or facsimile number as designated by notice pursuant to this Section.

> If to FRANCHISOR:  AVF FRANCHISING, LLC
> Attention:  Andrew Dolski, Regional Manager
> 6500 E. 14 Mile Road
> Warren, Michigan 48092
> Tele. No. 586-983-2015

> If to Franchisee:  See Item 5 of Appendix A.

**17.7  Unavoidable Contingencies.**

Neither party will be responsible for any contingency that is unavoidable or beyond its control, such as strike, flood, war, rebellion, governmental limitation or Act of God.

**17.8  Entire Agreement; Modifications.**

This Agreement and all appendices and other documents attached to this Agreement which are incorporated in this Agreement, will constitute the entire agreement between the parties. This Agreement supersedes and replaces any and all previous or contemporaneous written and oral agreements or understandings, promises, representations or dealings between the parties. Nothing in this Section or otherwise in this Agreement is intended to disclaim or waive Franchisee's reliance on any authorized statements made in the Franchise Disclosure Document delivered to Franchisee or in the exhibits and amendments to the Franchise Disclosure Document. This Agreement may not be amended or modified except in a writing signed by both parties, except that FRANCHISOR may unilaterally modify the Franchise System and its specifications as provided in this Agreement.

**17.9 Severability.**

Each Section, part or provision of this Agreement will be considered severable. If any Section, part or provision is found unenforceable by a court of competent jurisdiction, that determination will not impair the operation or affect the validity of the remainder of this Agreement.

**17.10 Uniformity.**

Franchisee acknowledges that some franchisees may operate under different forms of franchise agreements and that consequently, FRANCHISOR's obligations and rights with respect to its various franchisees may differ materially in different circumstances.

**17.11 Obligations Joint and Several.**

If there is more than one individual or entity signing this Agreement as Franchisee, all such persons are jointly and individually liable for Franchisee's obligations under this Agreement.

**17.12 Signing by FRANCHISOR.**

The submission of this Agreement is not an offer by FRANCHISOR and FRANCHISOR is not bound in any way until this Agreement is signed by an executive officer or an authorized representative of FRANCHISOR.

**17.13 Ownership of Franchisee.**

The owners and percentage of ownership of Franchisee are listed on Appendix B.

**17.14 Headings.**

Article and Section headings are for convenience of reference only and do not limit or affect the provisions of this Agreement.

**17.15 No Class Action or Consolidation.**

Each party hereto agrees that any mediation, arbitration or litigation will only be conducted on an individual, not a class-wide basis, and that an arbitration or litigation proceeding between the FRANCHISOR and Franchisee may not be consolidated with any other litigation or arbitration proceeding between the parties and any other person, corporation, limited liability company, partnership or other entity. The parties waive, to the fullest extent allowed by law, any right to pursue or participate as a lead plaintiff, petitioner or class representative in any claim on a class or consolidated basis.

## Article 18 – Representations and Acknowledgements

**18.1 No Authority.**

NO SALESPERSON, REPRESENTATIVE OR OTHER PERSON HAS THE AUTHORITY TO BIND OR OBLIGATE FRANCHISOR EXCEPT ITS AUTHORIZED OFFICER BY A WRITTEN DOCUMENT. FRANCHISEE ACKNOWLEDGES THAT NO REPRESENTATIONS, PROMISES, INDUCEMENTS, GURANTEES OR WARRANTIES OF ANY KIND ARE MADE BY FRANCHISOR OR ON FRANCHISOR'S BEHALF WHICH HAVE LED FRANCHISEE TO ENTER INTO THIS AGREEMENT. FRANCHISEE UNDERSTANDS THAT WHETHER FRANCHISEE SUCCEEDS AS A FRANCHISEE IS DEPENDENT UPON YOUR EFFORTS, BUSINESS JUDGMENTS. THE PERFORMANCE OF YOUR EMPLOYEES, MARKET CONDITIONS AND VARIABLE FACTORS BEYOND OUR CONTROL OR

INFLUENCE. FRANCHISEE FURTHER UNDERSTANDS THAT SOME FRANCHISEES ARE MORE OR LESS SUCCESSFUL THAN OTHER FRANCHISEES AND THAT FRANCHISOR HAS MADE NO REPRESENTATION THAT FRANCHISEE WILL DO AS WELL AS ANY OTHER FRANCHISEE.

**18.2   Receipt.**

FRANCHISEE ACKNOWLEDGES RECEIPT OF FRANCHISOR'S FRANCHISE DISCLOSURE DOCUMENT NOT LESS THAN 14 CALENDAR DAYS PRIOR TO THE EXECUTION OF THIS AGREEMENT. FRANCHISEE FURTHER ACKNOWLEDGES THAT FRANCHISEE RECEIVED A COMPLETED COPY OF THIS AGREEMENT AND ALL RELATED AGREEMENTS ATTACHED TO THE FRANCHISE DISCLOSURE DOCUMENT, WITH ANY CHANGES TO SUCH AGREEMENTS UNILATERALLY AND MATERIALLY MADE BY FRANCHISOR AT LEAST SEVEN (7) CALENDAR DAYS PRIOR TO THE DATE ON WHICH THIS AGREEMENT AND ALL RELATED AGREEMENTS WERE EXECUTED.

**18.3   Opportunity for Review by Franchisee's Advisors.**

FRANCHISEE ACKNOWLEDGES THAT FRANCHISOR HAS RECOMMENDED, AND THAT FRANCHISEE HAS HAD THE OPPORTUNITY TO OBTAIN, REVIEW OF THIS AGREEMENT AND FRANCHISOR'S FRANCHISE DISCLOSURE DOCUMENT BY FRANCHISEE'S LAWYER, ACCOUNTANT OR OTHER BUSINESS ADVISOR PRIOR TO EXECUTION HEREOF.

**18.4   Execution of Agreement.**

EACH OF THE UNDERSIGNED PARTIES WARRANTS THAT IT HAS THE FULL AUTHORITY TO SIGN AND EXECUTE THIS AGREEMENT. IF YOU ARE A PARTNERSHIP, LIMITED LIABILITY COMPANY OR CORPORATION, THE PERSON EXECUTING THIS AGREEMENT ON BEHALF OF SUCH PARTNERSHIP, LIMITED LIABILITY COMPANY OR CORPORATION WARRANTS TO FRANCHISOR, BOTH INDIVIDUALLY AND IN HIS CAPACITY AS PARTNER, MEMBER, MANAGER OR OFFICER, THAT ALL OF THE PARTNERS OF THE PARTNERSHIP, ALL OF THE MEMBERS OR MANAGERS OF THE LIMITED LIABILITY COMPANY, OR ALL OF THE SHAREHOLDERS OF THE CORPORATION, AS APPLICABLE, HAVE READ AND APPROVED THIS AGREEMENT, INCLUDING ANY RESTRICTIONS WHICH THIS AGREEMENT PLACES UPON RIGHTS TO TRANSFER THEIR INTEREST IN THE PARTNERSHIP, LIMITED LIABILITY COMPANY OR CORPORATION.

**18.5   Independent Investigation.**

FRANCHISEE ACKNOWLEDGES THAT FRANCHISEE HAS CONDUCTED AN INDEPENDENT INVESTIGATION OF THE BUSINESS CONTEMPLATED BY THIS AGREEMENT AND RECOGNIZES THAT IT INVOLVES BUSINESS RISKS WHICH MAKE THE SUCCESS OF THE VENTURE LARGELY DEPEND UPON FRANCHISEE'S BUSINESS ABILITIES AND EFFORTS. FRANCHISEE ACKNOWLEDGES THAT IT HAS BEEN GIVEN THE OPPORTUNITY TO CLARIFY ANY PROVISION OF THIS AGREEMENT THAT FRANCHISEE MAY NOT HAVE INITIALLY UNDERSTOOD AND THAT FRANCHISOR HAS ADVISED FRANCHISEE TO HAVE THIS AGREEMENT REVIEWED BY AN ATTORNEY.

**18.6  Reliance.**

YOU UNDERSTAND THAT FRANCHISOR AND ANY OF FRANCHISOR'S REPRESENTATIVES AND/OR AGENTS WITH WHOM FRANCHISEE HAS MET HAVE NOT MADE AND ARE NOT MAKING ANY PROMISES OR GUARANTEES AS TO THE EXTENT OF FRANCHISEE'S SUCCESS IN FRANCHISEE'S FRANCHISED BUSINESS, AND HAVE NOT AND ARE NOT IN ANY WAY PROMISING ANY SPECIFIC AMOUNTS OF EARNINGS OR PROFITS IN ASSOCIATION WITH FRANCHISEE'S BUSINESS.  IF ANY SUCH PROMISES, STATEMENTS OR REPRESENTATIONS HAVE BEEN MADE, FRANCHISEE AGREES TO ADVISE FRANCHISOR BEFORE SIGNING THIS AGREEMENT AND UNDERSTAND THAT FRANCHISEE CANNOT RELY UPON THEM IN MAKING FRANCHISEE'S DECISION.

FRANCHISOR and Franchisee have signed this Agreement on the dates set forth beside their signatures to be effective as of the date set forth at the beginning of this Agreement.


WITNESS:                              **AVF FRANCHISING, LLC**


_____                     By: _____
                                      Name: Keri Durkin
                                      Its: Vice President


                                      Dated: _____


                                      **SOUTHERN HOME FURNISHINGS, LLC**


_Pam McCord_                          By: _____
                                      Name: Michael McCord
                                      Its:  Managing Member

                                      Dated: __4/18/18_____

**EXHIBIT P**

**RECEIPT**
**(OUR COPY)**

THIS DISCLOSURE DOCUMENT SUMMARIZES CERTAIN PROVISIONS OF THE FRANCHISE AGREEMENT AND OTHER INFORMATION IN PLAIN LANGUAGE. READ THIS DISCLOSURE DOCUMENT AND ALL AGREEMENTS CAREFULLY.

IF AVF FRANCHISING, LLC OFFERS YOU A FRANCHISE, WE MUST PROVIDE THIS DISCLOSURE DOCUMENT TO YOU 14 CALENDAR DAYS BEFORE YOU SIGN A BINDING AGREEMENT WITH, OR MAKE A PAYMENT TO, THE FRANCHISOR OR ANY AFFILIATE IN CONNECTION WITH THE PROPOSED FRANCHISE SALE.

MARYLAND, NEW YORK AND RHODE ISLAND REQUIRE THAT WE GIVE YOU THIS DISCLOSURE DOCUMENT AT THE EARLIER OF THE FIRST PERSONAL MEETING OR 10 BUSINESS DAYS BEFORE YOU SIGN A BINDING AGREEMENT WITH US OR MAKE ANY PAYMENT TO US. MICHIGAN , OREGON, WASHINGTON AND WISCONSIN REQUIRE US TO GIVE YOU THIS DISCLOSURE DOCUMENT AT LEAST 10 BUSINESS DAYS BEFORE SIGNING A BINDING AGREEMENT WITH US OR PAYING ANY CONSIDERATION, WHICHEVER IS FIRST TO OCCUR.

IF AVF FRANCHISING, LLC DOES NOT DELIVER THIS DISCLOSURE DOCUMENT ON TIME OR IF IT CONTAINS A FALSE OR MISLEADING STATEMENT, OR A MATERIAL OMISSION, A VIOLATION OF FEDERAL AND STATE LAW MAY HAVE OCCURRED AND SHOULD BE REPORTED TO THE FEDERAL TRADE COMMISSION, WASHINGTON, DC 20580 AND YOUR STATE AGENCY, IF ONE IS LISTED IN EXHIBIT M OF THIS DISCLOSURE DOCUMENT.

The franchise sellers for this offering are: Andrew Dolski and Tony Gwizdala, AVF Franchising, LLC, 6500 E. 14 Mile Road, Warren, Michigan 48092, telephone: 586-983-2515. On the date below, I received a Disclosure Document with an issuance date of January 29, 2018, that included the following Exhibits:

| | |
|---|---|
| Exhibit A – Financial Statements | Exhibit I - Acknowledgment Addendum to Franchise Agreement |
| Exhibit B - Franchise Agreement, Rider, Promissory Notes and Security Agreement/State Addenda | Exhibit J – General Release of All Claims |
| Exhibit C – Area Development Agreement | Exhibit K – Table of Contents to Operations Manual |
| Exhibit D – Personal Guaranty | Exhibit L – List of Franchisees/Company Units |
| Exhibit E – Confidentiality Agreement | Exhibit M - List of State Administrators |
| Exhibit F - Assignment of Telephone Service Agreement Authorization | Exhibit N - List of Agents for Service of Process |
| Exhibit G - Authorization Agreement for Electronic Funds Transfer | Exhibit O – State Addenda and Agreement Riders |
| Exhibit H – Consent for Credit and Background Check | Exhibit P – Receipts |

PROSPECTIVE FRANCHISEE:

If a business entity:  
Souttern Home Furnishings LLC  
Name of Business Entity

By: _Michael L. McCord_

Its: _Managing Member_

Print Name: _Michael L. McCord_

Dated: _April 2, 2018_
     (Do not leave blank)

If an individual:

_____

(Print Name): _____

Dated: _____
     (Do not leave blank)

Please sign this copy of the receipt, print the date on which you received this Disclosure Document, and return it by mail, facsimile or email to Robert Anderson, Legal Department, AVF Franchising, LLC, 6400 E. 14 Mile Road, Warren, MI 48092, Facsimile: (586) 983-3029; Email: randerson@artvan.com.

IN WITNESS WHEREOF, the Franchisee has executed this General Release as of the Effective Date.

AVF FRANCHISING, LLC

By: _____

Printed Name: _____

Title: _____

FRANCHISEE:

_SouThern Home Furnishings, LLC_

By: _Michael L. McCord_

Printed Name: _Michael L. McCord_

Title: _Managing Member_

[if applicable]
FRANCHISEE OWNER:

_____

Printed Name: _____

Title: _____